**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| BOSTON MARKET CORPORATION,<br><br>        Plaintiff,<br><br>v.<br><br>TYSON FOODS, INC.; TYSON CHICKEN, INC.; TYSON BREEDERS, INC.; TYSON POULTRY, INC.; PILGRIM'S PRIDE CORPORATION; KOCH FOODS, INC.; JCG FOODS OF ALABAMA, LLC; JCG FOODS OF GEORGIA, LLC; KOCH MEAT CO., INC.; SANDERSON FARMS, INC.; SANDERSON FARMS, INC. (FOOD DIVISION); SANDERSON FARMS, INC. (PRODUCTION DIVISION); SANDERSON FARMS, INC. (PROCESSING DIVISION); HOUSE OF RAEFORD FARMS, INC.; MAR-JAC POULTRY, INC.; PERDUE FARMS INC.; PERDUE FOODS LLC; WAYNE FARMS, LLC; FIELDALE FARMS CORPORATION; GEORGE'S, INC.; GEORGE'S FARMS, INC.; SIMMONS FOODS, INC.; SIMMONS PREPARED FOODS, INC.; O.K. FOODS, INC.; O.K. FARMS, INC.; O.K. INDUSTRIES, INC.; PECO FOODS, INC.; HARRISON POULTRY, INC.; FOSTER FARMS, LLC; FOSTER POULTRY FARMS; NORMAN W. FRIES, INC. d/b/a CLAXTON POULTRY FARMS, INC.; MOUNTAIRE FARMS, INC.; MOUNTAIRE FARMS, LLC; MOUNTAIRE FARMS OF DELAWARE, INC.; AMICK FARMS, LCC; THE AMICK COMPANY, INC., AMICK-OSI BROILERS, LLC; AMICK-OSI PROCESSING, LLC; CASE FOODS, INC.; CASE FARMS, LLC; CASE FARMS PROCESSING, INC.; and AGRI STATS, INC,<br><br>        Defendants. | **COMPLAINT**<br><br>**Jury Trial Demanded** |

Plaintiff Boston Market Corporation ("Boston Market"), brings this action for damages under the antitrust laws of the United States and the laws of Arizona, California, District of Columbia, Florida, Illinois, Kansas, Michigan, Minnesota, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, Rhode Island, South Carolina, Virginia and Wisconsin against Tyson Foods, Inc.; Tyson Chicken, Inc.; Tyson Breeders, Inc.; Tyson Poultry, Inc.; Pilgrim's Pride Corporation; Koch Foods, Inc.; JCG Foods of Alabama, LLC; JCG Foods of Georgia, LLC; Koch Meat Co., Inc.; Sanderson Farms, Inc.; Sanderson Farms, Inc. (Food Division); Sanderson Farms, Inc. (Production Division); Sanderson Farms, Inc. (Processing Division); House of Raeford Farms, Inc.; Mar-Jac Poultry, Inc.; Perdue Farms Inc.; Perdue Foods LLC; Wayne Farms, LLC; Fieldale Farms Corporation; George's, Inc.; George's Farms, Inc.; Simmons Prepared Foods, Inc.; O.K. Foods, Inc.; O.K. Farms, Inc.; O.K. Industries, Inc.; Peco Foods, Inc.; Harrison Poultry, Inc.; Foster Farms, LLC; Foster Poultry Farms; Norman W. Fries, Inc. d/b/a Claxton Poultry Farms, Inc.; Mountaire Farms, Inc.; Mountaire Farms, LLC; Mountaire Farms of Delaware, Inc.; Amick Farms, LLC; The Amick Company, Inc.; Amick-OSI Broilers, LLC; Amick-OSI Processing, LLC; Case Foods, Inc.; Case Farms, LLC; Case Farms Processing, Inc.; and Agri Stats, Inc. (collectively, the "Defendants"), and alleges:

## I.        INTRODUCTION

1.        Defendants are horizontal competitors in the United States chicken market. Defendants and their co-conspirators conducted a long-running conspiracy (the "Conspiracy") extending from at least January 2008 through at least 2017 (the "Conspiracy Period") to restrain production, manipulate price indices, fix prices and rig bids, the purpose and effect of which was to fix, raise, stabilize and maintain prices of chicken meat throughout the United States.

2.     Chickens raised for meat consumption ("Broilers" or "Broiler")[1] constitute approximately 98% of all chicken meat sold in the United States.  Defendants are the leading suppliers of Broilers and control approximately 90% of the wholesale Broiler market.  The Broiler industry is a highly concentrated market with over $30 billion in annual wholesale revenue.

3.     The commoditized nature of Broilers, in conjunction with the (a) significantly high barriers to entry, (b) access to competitors' commercially sensitive data, (c) highly concentrated market dominated by vertically-integrated producers, (d) inelastic demand for the product, and (e) opportunities to conspire at trade association meetings, investor conferences, competitor plant tours, and other contacts among competitors made the Broiler industry particularly susceptible to anticompetitive manipulation.  These factors, among others, enabled Defendants to effectively conspire to inflate the prices of Broilers above those that would prevail in a competitive market.

4.     In 2007, the price of Broilers decreased.  As a result—commencing as early as January 2008 and continuing throughout the Conspiracy Period—Defendants conspired to curtail competition in the market for Broilers by reducing the supply of Broilers, manipulating the price indices for wholesale Broilers, and fixing prices and rigging bids for Small Bird Broilers[2] sold to Boston Market and other restaurants.

5.     Defendants used multiple means to sustain the Conspiracy.  First, beginning in 2008, Defendants engaged in a series of supply reductions at the start of the distribution chain. Defendants purposefully destroyed breeder hens and eggs to achieve these artificial decreases in

---

[1] Broiler chickens specifically refer to chickens raised for meat consumption to be slaughtered before the age of 10–13 weeks.  Broilers can be sold fresh or frozen, raw or cooked, or whole or in parts, or as a meat ingredient in a value added product.  As used in this Complaint the term "Broilers" excludes chicken grown, processed, and sold according to halal, kosher, free-range, or organic standards.

[2] Generally, Small Birds are defined as birds slaughtered between 7 and 9 weeks, weighing less than 4 and 1/4 pounds.

Broiler supply. Defendants also manipulated the price index associated with wholesale Broiler prices at the end of the distribution chain. Defendants' conduct ensured that buyers purchased Broilers from Defendants at inflated non-competitive prices.

6.      In furtherance of the Conspiracy, Defendants reached anti-competitive agreements and understandings during regularly scheduled trade association meetings, investor conferences, competitor plant tours, and other contacts with one another.

7.      Defendants also coordinated their strategy for achieving their desired anti-competitive ends by exchanging confidential and commercially sensitive information regarding production, capacity, and pricing of Broilers. As part of this strategy, Defendants exchanged information regarding anticipated future production through Defendant Agri Stats, Inc. ("Agri Stats"). Defendants used this data to coordinate production outputs, monitor each other's production figures for Broilers, and otherwise facilitate the Conspiracy.

8.      Defendants also engaged in a conspiracy targeted at restaurants like Boston Market that purchased Small Bird Broilers ("Small Bird Conspiracy"). Boston Market, like many restaurants, contracted directly with Defendants for the purchase of their proprietary chicken products. Boston Market submitted requests for bids to multiple Defendants to supply the Boston Market system with Small Bird Broilers.

9.      Starting as early as 2012 and continuing until as late as 2017 ("Small Bird Conspiracy Period"), Defendants conspired to fix prices and submit artificially high bids to Boston Market and other restaurants in an effort to drive up Small Bird Broiler prices, and in turn, Defendants' profits.

10.      As a result of Defendants' Small Bird price-fixing and bid-rigging Conspiracy, Defendants were able to exact significant price increases from Boston Market and other restaurants

at the same time wholesale prices of Small Bird Broilers were decreasing.

11.     Defendants adhered to their collusive agreements and understandings throughout the Conspiracy Period.  Defendants reaped the benefits of their illegal conduct through their production and sale—directly and through their wholly-owned or controlled subsidiaries and affiliates—of Broilers at inflated non-competitive prices.  Indeed, during key periods in the Conspiracy Period Defendants continuously urged one another to "lower supply in order to offset reduced demand and to support higher market prices."

12.     Through their collusive, anticompetitive actions, Defendants negated the economic benefits of increased competition.  Defendants' conduct resulted in their customers, including Boston Market, paying at least hundreds of millions of dollars in overcharges to Defendants.

13.     Defendants concealed their anticompetitive and unlawful conduct from their customers, regulators, and the public.  For instance, it was not publicly known until November 2016 that certain Defendants and their co-conspirators manipulated and artificially inflated the George Dock price index.  And, it was not until June 2020 with the Department of Justice's Indictment of executives of Defendants Claxton and Pilgrim's Pride that Defendants' conspiracy to fix prices and rig bids of Small Bird Broilers to restaurants like Boston Market was revealed.

14.     "Plus factors" are economic actions and outcomes, above and beyond parallel conduct by oligopolistic firms that are generally inconsistent with unilateral conduct but largely consistent with explicitly coordinated action.  Numerous "plus factors" existed in the Broiler industry during the Conspiracy Period including, but not limited to: (i) extensive information sharing through Agri Stats and other means; (ii) numerous opportunities for Defendants to collude in a variety of forums; (iii) inter-Defendant trades and purchases that often were against independent self-interest; (iv) increased exports of Broilers to other countries that were also often

4

against independent self-interest; (v) multiple industry characteristics that facilitated collusion, such as high vertical integration, high barriers to entry, high industry consolidation and concentration, inelastic supply and demand, a lack of significant substitutes for chicken, depressed economic conditions, and a history of government investigations and collusive conduct; and (vii) the manipulation of the Georgia Dock price index.

## II.  PARTIES

### A.      Plaintiff

15.     Boston Market Corporation is a Delaware corporation with its principal place of business in Golden, Colorado.  During the Conspiracy Period, Boston Market operated over 450 stores across the country, and was registered to do business in each state in which it operated, including Arizona, California, District of Columbia, Florida, Illinois, Kansas, Michigan, Minnesota, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, Rhode Island, South Carolina, Virginia and Wisconsin.

16.     Boston Market brings this action on its own behalf, and additionally and alternatively, as assignee of its purchasing agents, Ben E. Keith Company d/b/a Ben E. Keith Foods, HAVI Global Solutions, Mattingly Foods, Inc., and McLane Foodservice, Inc. f/k/a MBM Corporation, Willow Run Foods, Inc., and their respective affiliates ("Assignors").  During the Conspiracy Period, Boston Market purchased Broilers directly from Defendants, Defendants' subsidiaries and affiliates, entities owned or controlled by Defendants, or agents Defendants or Defendants' subsidiaries and affiliates controlled.

17.     Also during the Conspiracy Period, Assignors purchased Broilers on Boston Market's behalf from Defendants and/or their co-conspirators, including Tyson and Pilgrim's Pride. Assignors have assigned their claims arising out of these purchases to Boston Market.

18.     Boston Market and its Assignors purchased hundreds of millions of dollars' worth of Broilers from Defendants directly at artificially inflated prices throughout the Conspiracy Period. Boston Market contracted directly with Defendants for the purchase of Broilers, negotiating the price and quantity at which Defendants would supply Broilers to Boston Market.

19.     Boston Market also purchased Broilers indirectly from Defendants, Defendants' subsidiaries and affiliates, entities owned or controlled by Defendants, or agents Defendants or Defendants' subsidiaries and affiliates controlled for use in food preparation in Boston Market's locations, and not for resale in unaltered form.

20.     The purchase orders for Broilers supplied to Boston Market restaurants were created and issued from Boston Market restaurant locations in multiple states, including Arizona, California, District of Columbia, Florida, Illinois, Kansas, Michigan, Minnesota, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, Rhode Island, South Carolina, Virginia and Wisconsin.  Boston Market restaurants also received invoices for and shipments of Broilers.  As such, Boston Market has suffered antitrust injury as a result of Defendants' anticompetitive and unlawful conduct.

21.     Boston Market was damaged by Defendants' anticompetitive and illegal conduct by paying artificially inflated prices for Broilers.  Boston Market brings this action to recover the overcharges it paid for Broilers purchased during the Conspiracy Period.

### B.     Defendants

(i)     <u>Tyson</u>

22.     Defendant Tyson Foods, Inc. is a publicly held Delaware corporation headquartered in Springdale, Arkansas.

23.     Defendant Tyson Chicken, Inc. is a Delaware corporation headquartered in Springdale, Arkansas.  Tyson Chicken, Inc. is a wholly-owned subsidiary of Defendant Tyson

Foods, Inc.

24.     Defendant Tyson Breeders, Inc. is a Delaware corporation headquartered in Springdale, Arkansas.  Tyson Breeders, Inc. is a wholly-owned subsidiary of Defendant Tyson Foods, Inc.

25.     Defendant Tyson Poultry, Inc. is a Delaware corporation headquartered in Springdale, Arkansas.  Tyson Poultry, Inc. is a wholly-owned subsidiary of Defendant Tyson Foods, Inc.

26.     Defendants Tyson Foods, Inc., Tyson Chicken, Inc., Tyson Breeders, Inc. and Tyson Poultry, Inc. are collectively referred to as "Tyson."  During the Conspiracy Period, Tyson, its predecessors, subsidiaries, or affiliates sold Broilers in interstate commerce, directly or through owned or controlled subsidiaries and affiliates, to purchasers in the United States.

27.     Tyson reported a wide variety of data to Defendant Agri Stats including information about its breeder flocks and hatchery capacity, and data for its complexes in Virginia, Pennsylvania, North Carolina, Georgia, Alabama, Mississippi, Texas, Arkansas, Missouri, Indiana, Tennessee, and Kentucky.  Tyson was one of the ten Defendants that submitted false and artificially inflated price quotes to the Georgia Department of Agriculture ("GDA").  One of Tyson's plant managers served on the Georgia Dock Advisory Board.

(ii)     Pilgrim's Pride

28.     Defendant Pilgrim's Pride Corporation ("Pilgrim's Pride") is a publicly held Delaware corporation headquartered in Greeley, Colorado.

29.     In December 2008, Pilgrim's Pride filed a voluntary Chapter 11 petition in the United States Bankruptcy Court for the Northern District of Texas.  Effective December 28, 2009, Pilgrim's Pride was discharged from bankruptcy under a plan of reorganization that paid all creditors in full largely due to rising Broiler prices leading to increased profits at Pilgrim's Pride.

7

30.     After its discharge from bankruptcy, Pilgrim's Pride reaffirmed its participation in the Conspiracy.

31.     Accordingly, Pilgrim's Pride is liable for all conspiratorial acts undertaken during the entire Conspiracy Period.

32.     During the Conspiracy Period, Pilgrim's Pride, its predecessors, subsidiaries, or affiliates sold Broilers in interstate commerce, directly or through owned or controlled subsidiaries and affiliates, to purchasers in the United States.

33.     Pilgrim's Pride reported a wide variety of data to Agri Stats, including information about its breeder flocks and hatchery capacity, and data for its complexes in Virginia, West Virginia, North Carolina, Georgia, Tennessee, Florida, South Carolina, Alabama, Texas, Arkansas, and Kentucky. Pilgrim's Pride was one of the ten Defendants that submitted false and artificially inflated price quotes to the GDA.   Pilgrim's Pride's Executive Vice President of Sales and Operations served on the Georgia Dock Advisory Board.

(iii)     Koch

34.     Defendant Koch Foods, Inc. is a privately held Delaware corporation headquartered in Park Ridge, Illinois.

35.     Defendant JCG Foods of Alabama, LLC is an Alabama limited liability corporation headquartered in Park Ridge, Illinois.  JCG Foods of Alabama, LLC is a wholly-owned subsidiary of Defendant Koch Foods, Inc.

36.     Defendant JCG Foods of Georgia, LLC is a Georgia limited liability corporation headquartered in Park Ridge, Illinois.  JCG Foods of Alabama, LLC is a wholly-owned subsidiary of Defendant Koch Foods, Inc.

37.     Defendant Koch Meat Co., Inc. is an Illinois corporation headquartered in Chicago. Koch Meat Co., Inc. is a wholly-owned subsidiary of Defendant Koch Foods, Inc.

38.     Defendants Koch Foods, Inc., JCG Foods of Alabama, LLC, JCG Foods of Georgia, LLC and Koch Meat Co., Inc. are collectively referred to as "Koch."

39.     During the Conspiracy Period, Koch, its predecessors, subsidiaries, or affiliates sold Broilers in interstate commerce, directly or through owned or controlled subsidiaries and affiliates, to purchasers in the United States.

40.     Koch reported a wide variety of data to Agri Stats, including information about its breeder flocks and hatchery capacity, and data for its complexes in Georgia, Tennessee, and Alabama.   Koch, through JCG Foods of Georgia, LLC, was one of the ten Defendants that submitted false and artificially inflated price quotes to the GDA.  Koch's Vice-President of Sales served on the Georgia Dock Advisory Board.

(iv)     <u>Sanderson Farms</u>

41.     Defendant Sanderson Farms, Inc. is a publicly held Mississippi corporation headquartered in Laurel, Mississippi.

42.     Defendant Sanderson Farms, Inc. (Foods Division) is a Mississippi corporation headquartered in Laurel, Mississippi.  Sanderson Farms, Inc. (Foods Division) is a wholly-owned subsidiary of Defendant Sanderson Farms, Inc.

43.     Defendant Sanderson Farms, Inc. (Production Division) is a Mississippi corporation headquartered in Laurel, Mississippi.  Sanderson Farms, Inc. (Production Division) is a wholly-owned subsidiary of Defendant Sanderson Farms, Inc.

44.     Defendant Sanderson Farms, Inc. (Processing Division), a Mississippi corporation headquartered in Laurel, Mississippi.  Sanderson Farms, Inc. (Processing Division) is a wholly-owned subsidiary of Defendant Sanderson Farms, Inc.

45.     Defendants Sanderson Farms, Inc., Sanderson Farms, Inc. (Foods Division), Sanderson Farms, Inc. (Production Division) and Sanderson Farms, Inc. (Processing Division) are

9

collectively referred to as "Sanderson Farms."  During the Conspiracy Period, Sanderson Farms, its predecessors, subsidiaries, or affiliates sold Broilers in interstate commerce, directly or through owned or controlled subsidiaries and affiliates, to purchasers in the United States.

46.     Sanderson reported a wide variety of data to Agri Stats, including information about its breeder flocks and hatchery capacity, and data for its complexes in Georgia, Mississippi, and Texas.  Sanderson Farms was one of the ten Defendants that submitted false and artificially inflated price quotes to the GDA.

(v)     Raeford

47.     Defendant House of Raeford Farms, Inc. ("Raeford") is a privately held North Carolina corporation headquartered in Rose Hill, North Carolina.

48.     During the Conspiracy Period, Raeford, its predecessors, subsidiaries, or affiliates sold Broilers in interstate commerce, directly or through owned or controlled subsidiaries and affiliates, to purchasers in the United States.

49.     Raeford reported a wide variety of data to Agri Stats, including information about its breeder flocks and hatchery capacity, and data for its North Carolina and Louisiana complexes.

(vi)    Mar-Jac

50.     Defendant Mar-Jac Poultry, Inc. is a Georgia corporation headquartered in Gainesville, Georgia.  Mar-Jac Poultry, Inc. and its subsidiaries are controlled by Sterling Management Group, Inc.

51.     Mar-Jac Poultry MS, LLC is a Mississippi limited liability company located in Gainesville, Georgia.

52.     Mar-Jac Poultry AL, LLC is an Alabama limited liability company located in Gainesville, Georgia.

53.     Mar-Jac AL/MS, Inc. is a Delaware corporation located in Gainesville, Georgia.

54.     Mar-Jac Poultry, LLC is a Delaware limited liability company located in Gainesville, Georgia.

55.     Mar-Jac Holdings, Inc. is a Delaware corporation located in Gainesville, Georgia and is the parent company of Mar-Jac Poultry, Inc., Mar-Jac Poultry MS, LLC, Mar-Jac Poultry AL, LLC, Mar-Jac AL/MS, Inc., and Mar-Jac Poultry, LLC (collectively, "Mar-Jac").

56.     During the Conspiracy Period, Mar-Jac, its predecessors, subsidiaries, or affiliates sold Broilers in interstate commerce, directly or through owned or controlled subsidiaries and affiliates, to purchasers in the United States.

57.     Mar-Jac reported a wide variety of data to Agri Stats, including information about its breeder flocks and hatchery capacity, and data for its Gainesville, Georgia complex.  Mar-Jac was one of the ten Defendants that submitted false and artificially inflated price quotes to the GDA. Mar-Jac's Vice President of Operations served on the Georgia Dock Advisory Board.

(vii)   Perdue

58.     Defendant Perdue Farms Inc. is a privately held Maryland corporation headquartered in Salisbury, Maryland.

59.     Defendant Perdue Foods LLC, formerly known as Perdue Farms LLC, is a privately held Maryland limited liability corporation headquartered in Salisbury, Maryland.  Perdue Foods LLC is a subsidiary of Defendant Perdue Farms Inc.

60.     Defendants Perdue Farms Inc. and Perdue Foods LLC are together referred to as "Perdue."  During the Conspiracy Period, Perdue, its predecessors, subsidiaries, or affiliates sold Broilers in interstate commerce, directly or through owned or controlled subsidiaries and affiliates, to purchasers in the United States.

61.     Perdue reported a wide variety of data to Agri Stats, including information about its breeder flocks and hatchery capacity, and data for its complexes in Delaware, Maryland, North

Carolina, South Carolina, Florida, and Kentucky. Perdue was one of the ten Defendants that submitted false and artificially inflated price quotes to the GDA.

           (viii)   <u>Wayne Farms</u>

62.     Defendant Wayne Farms, LLC ("Wayne Farms") is a Delaware limited liability corporation headquartered in Oakwood, Georgia.

63.     During the Conspiracy Period, Wayne Farms, its predecessors, subsidiaries, or affiliates sold Broilers in interstate commerce, directly or through owned or controlled subsidiaries and affiliates, to purchasers in the United States.

64.     Wayne Farms reported a wide variety of data to Agri Stats, including information about its breeder flocks and hatchery capacity, and data for its complexes in North Carolina, Georgia, Alabama, Mississippi, and Arkansas. Wayne Farms was one of the ten Defendants that submitted false and artificially inflated price quotes to the GDA.  Its Vice President of Fresh Sales served on the Georgia Dock Advisory Board.

           (ix)   <u>Fieldale</u>

65.     Defendant Fieldale Farms Corporation ("Fieldale") is a privately held Georgia corporation headquartered in Baldwin, Georgia.

66.     During the Conspiracy Period, Fieldale, its predecessors, subsidiaries, or affiliates, sold Broilers in interstate commerce, directly or through owned or controlled subsidiaries and affiliates, to purchasers in the United States.

67.     Fieldale reported a wide variety of data to Agri Stats, including information about its breeder flocks and hatchery capacity, and its Gainesville, Georgia complex.  Fieldale was one of the ten Defendants that submitted false and artificially inflated price quotes to the GDA. Its owner and CEO also served on the Georgia Dock Advisory Board.

           (x)    <u>George's</u>

68.     Defendant George's Inc. is a privately held Arkansas corporation headquartered in Springdale, Arkansas.

69.     Defendant George's Farms, Inc., is a privately held Arkansas corporation headquartered in Springdale, Arkansas. George's Farms, Inc. is a wholly-owned subsidiary of George's, Inc.

70.     Defendants George's, Inc. and George's Farms, Inc. are together referred to as "George's."  During the Conspiracy Period, George's, its predecessors, subsidiaries, or affiliates sold Broilers in interstate commerce, directly or through owned or controlled subsidiaries and affiliates, to purchasers in the United States.

71.     George's reported a wide variety of data to Agri Stats, including information about its breeder flocks and hatchery capacity, and data for its complexes in Harrisonburg, Virginia and Springdale, Arkansas.

(xi)     Simmons

72.     Defendant Simmons Foods, Inc. is a privately held Arkansas corporation headquartered in Siloam Springs, Arkansas.  Simmons Foods reported a wide variety of data to Agri Stats, including information about its breeder flocks and hatchery capacity, and data for its two Siloam Springs, Arkansas complexes.

73.     Defendant Simmons Prepared Foods, Inc. is a privately held Arkansas company headquartered in Siloam Springs, Arkansas.  Simmons Prepared Foods, Inc. is a wholly-owned subsidiary of Simmons Foods, Inc.

74.     During the Conspiracy Period, Simmons Foods, Inc. exclusively sold the Broilers it produced to Simmons Prepared Foods, Inc., which in turn resold the Broilers in various forms to its customers.  Simmons Foods, Inc., its predecessors, subsidiaries, or affiliates was engaged in the processing, distribution, sale, pricing, and/or marketing of Broilers, directly or through its owned or

13

controlled subsidiaries and affiliates, to purchasers in the United States. Defendants Simmons Foods, Inc. and Simmons Prepared Foods, Inc. are collectively referred to as "Simmons."

(xii) O.K. Foods

75. Defendant O.K. Foods, Inc. is an Arkansas corporation headquartered in Fort Smith, Arkansas.

76. O.K. Farms, Inc. is an Arkansas corporation headquartered in Fort Smith, Arkansas. O.K. Farms, Inc. is a wholly-owned subsidiary of Defendant O.K. Foods, Inc.

77. O.K. Industries, Inc. is an Arkansas corporation headquartered in Fort Smith, Arkansas. O.K. Industries, Inc. is a wholly-owned subsidiary of Defendant O.K. Foods, Inc.

78. Defendants O.K. Foods, Inc., O.K. Farms, Inc. and O.K. Industries, Inc. are collectively referred to collectively as "O.K. Foods." During the Conspiracy Period, O.K. Foods, its predecessors, subsidiaries, or affiliates sold Broilers in interstate commerce, directly or through owned or controlled subsidiaries and affiliates, to purchasers in the United States.

79. The O.K. Foods entities are subsidiaries of the Mexican poultry conglomerate Industrias Bachoco. O.K. Foods reported a wide variety of data to Agri Stats, including information about its breeder flocks and hatchery capacity, and data for its Fort Smith, Arkansas complex.

(xiii) Peco Foods

80. Defendant Peco Foods, Inc. ("Peco Foods") is a privately held Alabama corporation headquartered in Tuscaloosa, Alabama.

81. During the Conspiracy Period, Peco Foods, its predecessors, subsidiaries, or affiliates sold Broilers in interstate commerce, directly or through owned or controlled subsidiaries and affiliates, to purchasers in the United States.

82. Peco Foods reported a wide variety of data to Agri Stats, including information about its breeder flocks and hatchery capacity, and data for its complexes in Gordo, Alabama and

14

Sebastopol, Louisiana.

(xiv)  Harrison

83.    Defendant Harrison Poultry, Inc. ("Harrison") is a Georgia corporation headquartered in Bethlehem, Georgia.

84.    During the Conspiracy Period, Harrison, its predecessors, subsidiaries, or affiliates sold Broilers in interstate commerce, directly or through owned or controlled subsidiaries and affiliates, to purchasers in the United States.

85.    Harrison reported a wide variety of data to Agri Stats, including information about its breeder flocks and hatchery capacity, and data for its Bethlehem, Georgia complex.  Harrison was one of the ten Defendants that submitted false and artificially inflated price quotes to the GDA. Harrison's owner and CEO served on the Georgia Dock Advisory Board.

(xv)  Foster Farms

86.    Defendant Foster Farms, LLC is a privately held California corporation headquartered in Modesto, California. Foster reported a wide variety of data to Agri Stats, including information about its breeder flocks and hatchery capacity, and data for its complexes in Fresno, California, Livingston, California, and the Pacific Northwest.

87.    Defendant Foster Poultry Farms is a privately held California corporation headquartered in Livingston, California.  Foster Poultry Farms is a related entity of Foster Farms, LLC.

88.    Defendants Foster Farms, LLC and Foster Poultry Farms are collectively referred to as "Foster Farms."  During the Conspiracy Period, Foster Farms, its predecessors, subsidiaries, or affiliates sold Broilers in interstate commerce, directly or through owned or controlled subsidiaries and affiliates, to purchasers in the United States.

(xvi)  Claxton

15

89.     Defendant Norman W. Fries, Inc. d/b/a Claxton Poultry Farms, Inc. ("Claxton") is a Georgia corporation headquartered in Claxton, Georgia.

90.     During the Conspiracy Period, Claxton, its predecessors, subsidiaries, or affiliates sold Broilers in interstate commerce, directly or through owned or controlled subsidiaries and affiliates, to purchasers in the United States.

91.     Claxton reported to Agri Stats a wide variety of data, including information about its breeder flocks and hatchery capacity and its Claxton, Georgia complex.  Claxton was one of the ten Defendants that submitted false and artificially inflated price quotes to the GDA. Its CEO served on the Georgia Dock Advisory Board.

(xvii)   Mountaire Farms

92.     Defendant Mountaire Farms, Inc. is a privately held Delaware corporation headquartered in Millsboro, Delaware.

93.     Defendant Mountaire Farms, LLC is a privately held Arkansas limited liability corporation headquartered in Little Rock, Arkansas.  Mountaire Farms, LLC is a wholly-owned subsidiary of Defendant Mountaire Farms, Inc.

94.     Defendant Mountaire Farms of Delaware, Inc. is a privately held Delaware corporation headquartered in Millsboro, Delaware.  Mountaire Farms of Delaware is a wholly-owned subsidiary of Defendant Mountaire Farms, Inc.

95.     Defendants Mountaire Farms, Inc., Mountaire Farms, LLC and Mountaire Farms of Delaware, Inc. are collectively referred to as "Mountaire Farms."  During the Conspiracy Period, Mountaire Farms, its predecessors, subsidiaries, or affiliates sold Broilers in interstate commerce, directly or through owned or controlled subsidiaries and affiliates, to purchasers in the United States.

96.     Mountaire Farms reported a wide variety of data to Agri Stats, including information

16

about its breeder flocks and hatchery capacity, and data for its complexes in Delaware and North Carolina.

(xviii) <u>Amick</u>

97.     Defendant Amick Farms, LLC is a privately held Delaware limited liability company with its corporate headquarters in Batesburg-Leesville, South Carolina, and with facilities in South Carolina, Maryland and Delaware.  Amick Farms, LLC is a wholly-owned subsidiary of OSI Group, LLC, a privately held Delaware corporation with its corporate headquarters in Aurora, Illinois.  During the Conspiracy Period, Amick Farms, LLC, its predecessors, subsidiaries, or affiliates sold Broilers in interstate commerce, directly or through owned or controlled subsidiaries and affiliates, to purchasers in the United States.

98.     Defendant The Amick Company, Inc. is a privately held South Carolina corporation with its corporate headquarters in Batesburg-Leesville, South Carolina, and is a wholly-owned subsidiary of OSI Group, LLC.  During the Conspiracy Period, The Amick Company, Inc., its predecessors, subsidiaries, or affiliates sold Broilers in interstate commerce, directly or through owned or controlled subsidiaries and affiliates, to purchasers in the United States

99.     Defendant Amick-OSI Broilers, LLC is a privately held Delaware limited liability company with its corporate headquarters in Batesburg-Leesville, South Carolina, and is a wholly-owned subsidiary of OSI Group, LLC.  During the Conspiracy Period, Amick-OSI Broilers, LLC, its predecessors, subsidiaries, or affiliates sold Broilers in interstate commerce, directly or through owned or controlled subsidiaries and affiliates, to purchasers in the United States

100.     Defendant Amick-OSI Processing, LLC is a privately held Delaware limited liability company with its corporate headquarters in Batesburg-Leesville, South Carolina, and is a wholly-owned subsidiary of OSI Group, LLC.  During the Conspiracy Period, Amick-OSI Processing, LLC, its predecessors, subsidiaries, or affiliates sold Broilers in interstate commerce, directly or

through owned or controlled subsidiaries and affiliates, to purchasers in the United States

101.    Defendants Amick Farms, LLC, The Amick Company, Amick-OSI Broilers, LLC, and Amick-OSI Processing, LLC are collectively referred to as "Amick."  During the Conspiracy Period, Amick, its predecessors, subsidiaries, or affiliates sold Broilers in interstate commerce, directly or through its owned or controlled subsidiaries and affiliates, to purchasers in the United States.

102.    Amick reported a wide variety of data to Agri Stats, including information about its breeder flocks, hatchery capacity, and processing complexes.

(xix)    Case Foods

103.    Case Foods, Inc. is a privately held Delaware corporation with its corporate headquarters in Troutman, North Carolina.  During the Conspiracy Period, Case Foods, Inc., its predecessors, subsidiaries, or affiliates sold Broilers in interstate commerce, directly or through its owned or controlled subsidiaries and affiliates, to purchasers in the United States.

104.    Case Farms, LLC is a privately held Delaware limited liability company with its corporate headquarters in Troutman, North Carolina, and with facilities and operations in Ohio and North Carolina.  Case Farms, LLC is a wholly-owned subsidiary of Case Foods, Inc.  During the Conspiracy Period, Case Farms, LLC, its predecessors, subsidiaries, or affiliates sold Broilers in interstate commerce, directly or through its owned or controlled subsidiaries and affiliates, to purchasers in the United States.

105.    Case Farms Processing, Inc. is a privately held North Carolina corporation with its corporate headquarters in Troutman, North Carolina, and with facilities and operations in North Carolina.  Case Farms Processing, Inc. is a wholly-owned subsidiary of Case Foods, Inc.  During the Conspiracy Period, Case Farms Processing, Inc., its predecessors, subsidiaries, or affiliates sold Broilers in interstate commerce, directly or through its owned or controlled subsidiaries and

affiliates, to purchasers in the United States.

106.    Producer Co-Conspirators Case Foods, Inc., Case Farms, LLC, and Case Farms Processing, Inc. are collectively referred to as "Case Foods."  During the Conspiracy Period, Case Foods, its predecessors, subsidiaries, or affiliates sold Broilers in interstate commerce, directly or through its owned or controlled subsidiaries and affiliates, to purchasers in the United States.

107.    Case Foods reported a wide variety of data to Agri Stats, including information about its breeder flocks, hatchery capacity, and processing complexes.

(xx)    Agri Stats

108.    Defendant Agri Stats, Inc. is an Indiana corporation headquartered in Fort Wayne, Indiana.  Agri Stats is a subsidiary of Eli Lilly & Co., a publicly-held Indiana corporation headquartered in Indianapolis.

109.    Agri Stats knowingly played an important and active role in Defendants' collusive scheme.  Agri Stats used the instrumentalities of interstate commerce to facilitate the Conspiracy, and its conduct was within the flow of, was intended to, and did have, a substantial effect on the interstate commerce of the United States, including in this District.

110.    Agri Stats profited by its participation in the Conspiracy through its receipt of payments from Defendants of a share of the revenues earned from artificially supracompetitive prices charged for Broilers as a result of the Conspiracy.  This resulted in Agri Stats collecting hundreds of thousands of dollars annually from Defendants.

111.    In 2008 and 2010—two key periods in the Conspiracy—a representative from Agri Stats was elected to the board of the National Chicken Council, one of the industry's most important trade associations.

112.    Several Defendants, including Wayne Farms and Pilgrim's Pride, hired former Agri Stats executives to work in senior sales positions, and Agri Stats employs or has employed several

former executives of Defendants.

## III.   CO-CONSPIRATORS

113.   Various companies not named as Defendants also performed acts and made statements in furtherance of the Conspiracy.   These co-conspirators who are not named as Defendants include the following:

### A.   Producer Co-Conspirator Allen Harim

114.   Harim USA, Ltd. is a privately held Delaware corporation with its corporate headquarters in Seaford, Delaware.

115.   Allen Harim Foods, LLC is a privately held Delaware limited liability company with its corporate headquarters in Seaford, Delaware, and with facilities and operations in Delaware, Maryland and North Carolina. Allen Harim Foods, LLC is a wholly-owned subsidiary of Harim USA, Ltd.

116.   Allen Harim Farms, LLC is a privately held Delaware limited liability company with its corporate headquarters in Seaford, Delaware, and with facilities and operations in Delaware, Maryland and North Carolina.  Allen Harim Farms, LLC is a wholly-owned subsidiary of Harim USA, Ltd.

117.   Producer Co-Conspirators Harim USA, Ltd., Allen Harim Foods, LLC, and Allen Harim Farms, LLC are collectively referred to as "Allen Harim."  During the Conspiracy Period, Allen Harim, its predecessors, subsidiaries, or affiliates sold Broilers in interstate commerce, directly or through its owned or controlled subsidiaries and affiliates, to purchasers in the United States.

### B.   Producer Co-Conspirator Keystone Foods

118. Keystone Foods LLC is a subsidiary of Marfrig Alimentos, S.A., a Brazilian company. On November 30, 2018, Defendant Tyson Foods, Inc. announced it had completed its acquisition of Keystone Foods LLC from Marfrig.

119. Keystone Foods Corporation was (now consolidated) a subsidiary of Keystone Foods, LLC and Marfrig Alimentos, S.A., a Brazilian company.

120. Equity Group Eufala Division, LLC is a Delaware limited liability company with its headquarters in Bakerhill, Alabama and is a wholly-owned subsidiary of Keystone Foods, LLC.

121. Equity Group Kentucky Division LLC, formerly known as Cagle's-Keystone Foods, L.L.C., is a Delaware limited liability company with its headquarters in Franklin, Kentucky and is a wholly-owned subsidiary of Grow-Out Holdings, LLC.

122. Equity Group – Georgia Division LLC is a Delaware limited liability company with its headquarters in Camilla, Georgia and is a wholly-owned subsidiary of Keystone Foods, LLC.

123. Keystone Foods, LLC, Keystone Foods Corporation, Equity Group Eufala Division, LLC, Equity Group Kentucky Division LLC, and Equity Group – Georgia Division LLC are collectively referred to as "Keystone Foods."

124. During the Conspiracy Period, Keystone Foods, its predecessors, subsidiaries, or affiliates sold Broilers in interstate commerce, directly or through its owned or controlled subsidiaries and affiliates, to purchasers in the United States.

125. Keystone Foods, Allen Harim, and the subsidiaries and affiliates identified above, are referred to collectively as the "Producer Co-Conspirators."

### C. The Defendant Family Co-Conspirators

126. Various subsidiaries and related entities of the Defendant families named herein actively participated in the Conspiracy and therefore are co-conspirators, including the following:

(i)     Koch

127.    JCG Industries, Inc., is an Illinois corporation with its headquarters in Chicago, Illinois, and is a wholly-owned subsidiary of Koch Foods, Inc.

128.    JCG Properties, L.L.C. is an Illinois limited liability company with its headquarters in Chicago, Illinois, and is a wholly-owned subsidiary of Koch Foods, Inc.

129.    JCG Land Holdings, LLC is an Illinois limited liability company with its headquarters in Park Ridge, Illinois, and is a wholly-owned subsidiary of Koch Foods, Inc.

130.    JCG Foods LLC is a Delaware limited liability company with its headquarters in Park Ridge, Illinois, and is a wholly-owned subsidiary of Koch Foods, Inc.

131.    Koch Foods of Cumming LLC, formerly known as Greko, L.L.C., is a Georgia limited liability company with its headquarters in Cumming, Georgia, and is a wholly-owned subsidiary of Koch Foods, Inc.

132.    Koch Foods of Gainesville LLC, formerly known as Gress Foods LLC, is a Georgia limited liability company with its headquarters in Gainesville, Georgia, and is a wholly-owned subsidiary of Koch Foods, Inc.

133.    JCG Farms of Georgia LLC is a Georgia limited liability company with its headquarters in Park Ridge, Illinois, and is a wholly-owned subsidiary of Koch Foods, Inc.

134.    Koch Foods of Mississippi LLC is a Mississippi limited liability company with its headquarters in Morton, Mississippi, and is a wholly-owned subsidiary of Koch Foods, Inc.

135.    Koch Farms of Mississippi LLC is a Mississippi limited liability company with its headquarters in Morton, Mississippi, and is a wholly-owned subsidiary of Koch Foods, Inc.

136.    Koch Freezers LLC is a Mississippi limited liability company with its headquarters in Morton, Mississippi, and is a wholly-owned subsidiary of Koch Foods, Inc.

137.    Koch Properties of Mississippi LLC was (presently dissolved) a Mississippi limited

liability company with its headquarters in Morton, Mississippi, and was a wholly-owned subsidiary of Koch Foods, Inc.

138.    Koch Foods of Alabama LLC is an Alabama limited liability company with its headquarters in Montgomery, Alabama, and is a wholly-owned subsidiary of Koch Foods, Inc.

139.    JCG Farms of Alabama LLC is an Alabama limited liability company with its headquarters in Park Ridge, Illinois, and is a wholly-owned subsidiary of Koch Foods, Inc.

140.    Koch Foods of Ashland LLC is an Alabama limited liability company with its headquarters in Montgomery, Alabama, and is a wholly-owned subsidiary of Koch Foods, Inc.

141.    Koch Farms of Ashland LLC is an Alabama limited liability company with its headquarters in Montgomery, Alabama, and is a wholly-owned subsidiary of Koch Foods, Inc.

142.    Koch Farms of Gadsden LLC is an Alabama limited liability company with its headquarters in Montgomery, Alabama, and is a wholly-owned subsidiary of Koch Foods, Inc.

143.    Koch Foods of Gadsden LLC is an Alabama limited liability company with its headquarters in Montgomery, Alabama, and is a wholly-owned subsidiary of Koch Foods, Inc.

144.    Koch Foods of Cincinnati LLC, f/k/a Preferred Foods, LLC, is an Ohio limited liability company with its headquarters in Fairfield, Ohio, and is a wholly-owned subsidiary of Koch Foods, Inc.

145.    Koch Foods LLC, operating under the assumed names Koch Foods of Chattanooga and Koch Foods of Morristown, is a Tennessee limited liability company with its headquarters in Chattanooga, Tennessee, and is a wholly- owned subsidiary of Koch Foods, Inc.

(ii)    Tyson

146.    Tyson Sales and Distribution, Inc. is a Delaware corporation with its headquarters in Springdale, Arkansas, and is a wholly-owned subsidiary of Tyson Foods, Inc.

        (iii)    <u>Perdue</u>

147.   Perdue Foods, Inc. (now dissolved) was a Maryland corporation with its headquarters in Salisbury, Maryland, and a wholly-owned subsidiary of Perdue Farms Inc.

148.   Harvestland Holdings, LLC was a Maryland limited liability company with its headquarters in Salisbury, Maryland and a wholly-owned subsidiary of Perdue Farms Inc.

149.   Perdue Food Products, Inc. was a Maryland limited liability company with its headquarters in Salisbury, Maryland and a wholly-owned subsidiary of Perdue Farms Inc.

150.   Perdue Farms Incorporated (now merged with Perdue Farms LLC) was a Maryland limited liability company with its headquarters in Salisbury, Maryland and a wholly-owned subsidiary of Defendant Perdue Farms Inc.

        (iv)    <u>Wayne Farms</u>

151.   WFSP Foods, LLC is a Georgia limited liability company with its headquarters in Decatur, Alabama, and is a wholly-owned subsidiary of Defendant Wayne Farms.

        (v)    <u>George's</u>

152.   George's Chicken, LLC is a Virginia limited liability company with its headquarters in Edinburg, Virginia, and is a wholly-owned subsidiary of Defendant George's, Inc.

153.   George's Family Farms, LLC is a Virginia limited liability company with its headquarters in Edinburg, Virginia and is a wholly-owned subsidiary of Defendant George's, Inc.

154.   George's Foods, LLC is a Virginia limited liability company with its headquarters in Edinburg, Virginia, and is a wholly-owned subsidiary of Defendant George's, Inc.

155.   George's of Missouri, Inc. is a Missouri corporation with its headquarters in Springdale, Arkansas, and is a wholly-owned subsidiary of Defendant George's, Inc.

156.   George's Processing, Inc. is an Arkansas corporation with its headquarters in

Springdale, Arkansas, and is a wholly-owned subsidiary of Defendant George's, Inc.

(vi)    <u>Peco Foods</u>

157.    Peco Farms of Mississippi, LLC is a Mississippi limited liability company with its headquarters in Jackson, Mississippi and is a wholly-owned subsidiary of Defendant Peco Foods, Inc.

(vii)    <u>Pilgrim's Pride</u>

158.    PFS Distribution Company is a Delaware company with its headquarters in Arlington, Texas and is a wholly-owned subsidiary of Defendant Pilgrim's Pride Corporation.

159.    Merit Provisions, LLC is a Texas limited liability company with its headquarters in Dallas, Texas and is a wholly-owned subsidiary of Defendant Pilgrim's Pride Corporation.

160.    GC Properties, LLC is a Georgia limited liability company with its headquarters in Powder Springs, Georgia and is a wholly-owned subsidiary of Defendant Pilgrim's Pride Corporation.

161.    Pilgrim's Pride of Nevada, Inc. is a Nevada corporation with its headquarters in Greeley, Colorado and is a wholly-owned subsidiary of Defendant Pilgrim's Pride Corporation.

162.    PPC Marketing, Ltd. is a Texas company with its headquarters in Pittsburg, Texas and is a wholly-owned subsidiary of Defendant Pilgrim's Pride Corporation.

163.    Pilgrim's Pride Corporation of West Virginia, Inc. is a West Virginia corporation with its headquarters in Greeley, Colorado and is a wholly-owned subsidiary of Defendant Pilgrim's Pride Corporation.

(viii)    <u>Foster Farms</u>

164.    Napoleon Poultry Supply LLC is a Delaware limited liability company with its headquarters in Livingston, California and is a wholly-owned subsidiary of Defendant Foster

Farms, LLC.

> (ix)     O.K. Foods

165.     O.K. Broiler Farms Limited Partnership was (presently dissolved) an Arkansas limited partnership with its headquarters in Fort Smith, Arkansas and is a wholly-owned subsidiary of Defendant O.K. Foods, Inc.

> (x)     Raeford

166.     House of Raeford Farms of Louisiana, L.L.C. is a Louisiana limited liability company with its headquarters in Shreveport, Louisiana and is a wholly-owned subsidiary of Defendant House of Raeford Farms, Inc.

167.     Johnson Breeders, Inc. is a North Carolina corporation with its headquarters in Rose Hill, North Carolina and is a wholly-owned subsidiary of Defendant House of Raeford Farms, Inc.

168.     Columbia Farms of Georgia, Inc. is a South Carolina corporation with its headquarters in Batesburgh-Leesville, South Carolina and is a wholly-owned subsidiary of Defendant House of Raeford Farms, Inc.

169.     Raeford Farms of Louisiana, L.L.C. is a Louisiana limited liability company with its headquarters in Arcadia, Louisiana and is a wholly-owned subsidiary of Defendant House of Raeford Farms, Inc.

170.     Columbia Farms, Inc. is a South Carolina corporation with its headquarters in Columbia, South Carolina and is a wholly-owned subsidiary of Defendant House of Raeford Farms, Inc.

171.     During the Conspiracy Period, each of the Defendant family co-conspirators identified above sold Broilers in interstate commerce, directly or through its owned or controlled subsidiaries and affiliates, to purchasers in the United States.

172.     Various other persons, firms, and corporations not named as defendants have performed acts and made statements in furtherance of the Conspiracy.  Defendants are jointly and severally liable for the acts of their co-conspirators whether or not named as defendants in this Complaint.  Throughout this Complaint, the Producer Co-Conspirators, the Defendant family co-conspirators identified above, and the other persons, firms, and corporations not named as defendants that performed acts and made statements in furtherance of the Conspiracy are collectively referred to as "Co-Conspirators."

173.     Whenever reference is made to any act of any corporation, the allegation means that the corporation engaged in the act by or through its officers, directors, agents, employees, or representatives while they were actively engaged in the management, direction, control or transaction of the corporation's business or affairs.

174.     Each of the Defendants acted as the agent of or joint-venturer for the other Defendants with respect to the acts, violations and common course of conduct alleged herein.

175.     Defendants are also liable for acts done in furtherance of the alleged Conspiracy by companies they acquired through mergers or acquisitions.

## IV.     JURISDICTION AND VENUE

176.     Boston Market brings this action under Section 1 of the Sherman Act, 15 U.S.C. § 1, and the state antitrust and consumer protection laws of the states listed herein to recover damages, including treble damages, costs of suit, and reasonable attorneys' fees, arising from Defendants' Conspiracy to restrain trade.

177.     The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1337(a).  The Court has supplemental jurisdiction over Boston Market's state law claims listed herein under 28 U.S.C. § 1367 because they arise from the same nucleus of operative facts

alleged in this Complaint. Boston Market's state law claims are so related to its claims under Section 1 of the Sherman Act that they form part of the same case or controversy.

178. Venue is proper in the Northern District of Illinois under 15 U.S.C. §§ 15(a), 22, and 28 U.S.C. §§ 1391(b) because: (i) Defendants resided, transacted business, were found, or had agents in this District during the Conspiracy Period, (ii) a substantial portion of the events giving rise to Boston Market's claim occurred in this District, or (iii) a substantial portion of Defendants' alleged wrongful conduct affecting interstate trade and commerce during the Conspiracy Period was carried out in this District.

179. This Court has jurisdiction over each Defendant named in this action, as Defendants transact business in the state of Illinois. Further, Defendants have substantial contacts in Illinois and engaged in a Conspiracy that was directed at and had a direct, foreseeable, and intended effect of causing injury to the business of persons and entities residing in, located in, or doing business in Illinois.

## V.        TRADE AND COMMERCE

180. During the Conspiracy Period, Defendants collectively controlled the market for Broilers in the United States.

181. The activities of Defendants and their co-conspirators, as described herein, were within the flow of, were intended to, and did have a direct, substantial, and reasonably foreseeable effect on United States trade or commerce, including intrastate commerce, as well as on Boston Market's operations in the states including Arizona, California, District of Columbia, Florida, Illinois, Kansas, Michigan, Minnesota, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, Rhode Island, South Carolina, Virginia and Wisconsin.

182.    Each Defendant, or one or more of its affiliates, used the instrumentalities of interstate commerce to join or effectuate their Conspiracy.  Specifically, during the Conspiracy Period, each Defendant, directly, or through one or more of its parents, affiliates, subsidiaries, or business units, knowingly and intentionally produced, shipped, and sold or delivered Broilers to United States purchasers, including Boston Market, in a continuous and uninterrupted flow of interstate commerce, including through and into this District.

183.    Defendants' Conspiracy directly and substantially affected the price of Broilers purchased by Boston Market during the Conspiracy Period.  Such conduct was meant to produce and did in fact produce a substantial harmful effect on interstate commerce in the form of artificially high prices paid for Broilers by customers, including Boston Market, during the Conspiracy Period.

184.    Defendants' Conspiracy proximately caused antitrust injury to Boston Market in the form of the supracompetitive prices it paid for Broilers during the Conspiracy Period, and gives rise to Boston Market's antitrust claims.

## VI.        OVERVIEW OF THE BROILER INDUSTRY

### A.        Broilers are a Commodity

185.    According to a 2012 report by Focus Management Group, Broilers are "a commodity product with little or no product differentiation based on the processors."  Defendants acknowledge that Broilers are a commodity.  For instance, Pilgrim's Pride CEO commented in February 2014 that "the chicken business per se is a commodity business."

186.    The commoditized nature of Broilers is evidenced by the fact that numerous Defendants purchased Broilers from each other to absorb excess supply in the market during the Conspiracy Period, and in turn, further their Conspiracy.

187.    There is a lack of differentiation among Broiler suppliers because virtually all suppliers sell USDA Grade A chicken.  As a result of the lack of product differentiation, Defendants

29

were forced to compete on price (absent collusion) such that the supply decisions of each Broiler producer impacted the market price for Broilers.

188.    While an individual producer often has the incentive to increase production to maximize profits, any increased production will ultimately reduce the profitability of the industry as a whole.  Thus, the commoditized nature of Broilers facilitates the implementation of a price-fixing scheme and provides industry players with the incentive to agree to reduce overall supply.

>    **B.    The United States Broiler Market is a National Market Worth Tens of Billions of Dollars Annually.**

189.    According to the U.S. Poultry & Egg Association, the value of wholesale U.S. Broilers produced in 2014 was $32.7 billion, up 6 percent from 2013. The market value varied between $21.8 and $30.7 billion from 2008-2013.

190.    About 50-70% of Broilers are sold under contract with a customer, about 10-20% are sold on the spot market, and roughly 17-20% are exported.

191.    Exports of Broilers from the United States account for approximately 45% of all United States meat exports.  Broilers produced in the U.S. are exported to well over 100 different countries, with the major export markets including Mexico, Canada, Hong Kong, and China.  Some of the exports from the United States include products less desirable to United States consumers, such as chicken feet or dark meat, but exports also increasingly include white meats and other products widely consumed in the United States.

192.    While this Complaint does not seek damages for Broilers sold into export commerce, Broilers exported from the United States decrease available supply and increase Broiler prices in the United States.  Therefore, exports by Defendants were an important mechanism used by Defendants to effectuate their United States-based Broiler market conspiracy.

>    **C.    Defendants Control the Highly Concentrated Broiler Industry**

193.    During the Conspiracy Period, Defendants collectively controlled nearly 90% of the single national market for Broilers in the United States.  The Broiler industry was almost entirely vertically integrated, with producers owning, or tightly controlling, each of the six stages of the supply chain: breeding, hatching, chick-rearing and feeding, slaughtering mature birds, processing, and selling of Broilers.

194.    At the top of the supply chain are Defendants' "breeder flocks," which include the hens that lay the eggs that, when hatched, become Broilers.

195.    Once Defendants' Broilers reach maturity, they are processed.  Per the USDA, "processing is the term used by the poultry industry to describe the conversion of live poultry into raw poultry products fit for human consumption."

196.    While some Broilers are sold without any further processing, some Broilers are then sometimes sent to affiliated companies for further processing, which, per the U.S. Poultry & Egg Association, is where "[t]he whole carcass or cut-up and deboned pieces are further processed for added value," (i.e., pre-marinated chicken).  Defendants' Conspiracy involved both pure chicken and value-added products.

197.    In 2010, agriculture economist Dr. Michael Dicks observed that vertical integration in the U.S. poultry industry incentivizes producers of Broilers to implement supply restrictions, stating "vertical coordination allows integrators to manage excess capacity to manage price . . . . Because of the inelastic nature of the supply and demand a reduction in supply will produce an outcome more preferable to the industry than maintaining supply with a lower price."

198.    There were high barriers to entry into the market for Broilers.  A new entrant into the market would face significant start-up costs, including multi-million dollar costs associated with research and development, construction of processing complexes, feed mills, hatcheries, equipment,

energy, transportation distribution infrastructure, skilled labor, experienced management, a skilled contract-farmer base in a specific geographic area, long-standing customer relationships, safety and quality assurance, and regulatory approvals for environmental, worker safety, and food safety issues.

199.     Prices for Broilers sold in the United States were quoted in "whole bird" or disassembled parts, with adjustments for transportation, product form (i.e., degree of processing or added value), and packaging at the time of sale.

200.     Defendants sell both small and large Broilers.  Small Birds (generally 4.25 pounds or less) are purchased primarily by restaurants like Boston Market that require quality and taste standardization for menu items across multiple locations.  Birds larger than 4.25 pounds, by contrast, generally are sold in tray pack or bagged form for sale in the retail and grocery channel.

### D.     Top Broiler Industry Executives Are the Subject of a Criminal Antitrust Indictment

201.     On June 3, 2020, the Department of Justice indicted Jayson Penn, President and CEO of Pilgrim's Pride, Mikell Fries, President of Claxton, Scott Brady, Vice President of Claxton, and Roger Austin Vice President of Pilgrim's Pride (the "Criminal Defendants"), in the District of Colorado.  The Indictment charges the Criminal Defendants with conspiring "to suppress and eliminate competition by rigging bids and fixing prices and other price-related terms for broiler chicken products sold in the United States" in violation of Section 1 of the Sherman Act.[3]

202.     Specifically, the Indictment alleges that from at least 2012 through at least 2017, the Criminal Defendants and at least seven broiler chicken suppliers conspired:

    a)     to reach agreements and understandings to submit aligned, though not necessarily identical, bids and to offer aligned, though not necessarily identical, prices, and

_____

[3] *United States of America v. Jayson Jeffrey Penn et al.,* Crim. Action No. 20-cr-00152-PAB (D. Col. June 2, 2020) [D.E. 1].

price-related terms, including discount levels, for broiler chicken products sold in the United States;

b)    to participate in conversations and communications relating to nonpublic information such as bids, prices, and price-related terms, including discount levels, for broiler chicken products sold in the United States with the shared understanding that the purpose of the conversations and communications was to rig bids, and to fix, maintain, stabilize, and raise prices and other price-related terms, including discount levels, for broiler chicken products sold in the United States; and

c)    to monitor bids submitted by, and prices and price-related terms, including discount levels, offered by, Suppliers and co-conspirators for broiler chicken products sold in the United States.

203.    The Indictment expressly identified as victims of the Criminal Defendants' conspiracy "[r]estaurants, grocery retailers and others who purchased large volumes of broiler chicken" who "received bids from or negotiated prices or other price-related terms, including discount levels, with Suppliers directly."

204.    Some of these victims, like Boston Market, purchased Broilers using a "cost-plus" pricing model "that varied month-to-month or period-to-period depending on the price of chicken feed and that also provided Suppliers with a per-pound margin and an 'adjustment' that was effectively an addition per-pound margin." Still other victims purchased chicken products "tied to a market index, such as the Urner-Barry Index."

205.    The Indictment sets forth a series of communications between Defendant competitors—via phone, email and text messages—sharing and coordinating confidential bidding and pricing information in connection with multiple restaurant and grocer victims' requests for bids.

### E. The Broiler Industry Was Previously Subject to Antitrust Litigation

206.    In 1973, the United States Department of Justice filed a civil antitrust action against the National Broiler Marketing Association ("NBMA") alleging the NBMA and its members conspired to fix prices and restrict the production of Broilers in violation of United States antitrust laws.  That conspiracy involved a conference call program where NBMA members (and even some non-members) coordinated the pricing and production of Broilers.  In response, numerous private civil antitrust actions were filed against NBMA and 42 individual defendants in the *In re Chicken Antitrust Litigation* case.  The NBMA and the other Broiler producer defendants eventually settled the case for approximately $30 million.

207.    More recently, several cases brought by contract-farmers against integrated Broiler producers have alleged violations of the Packers and Stockyards Act, including *Adams v. Pilgrim's Pride*, No. 2:09-cv-00397 (E.D. Tex.), *Been v. O.K. Industries*, No. 08-7078 (E.D. Okla.), and *Wheeler v. Pilgrim's Pride Corp.*, No. 5:06-cv-00004 (E.D. Tex.).  These cases also suggest an absence of true competition among Defendants in the Broiler industry.

## VII.    FACTUAL ALLEGATIONS REGARDING DEFENDANTS' CONSPIRACY

### A. The Small Bird Price-Fixing and Bid Rigging Conspiracy

208.    In addition to servicing domestic retail grocery channels and export markets, Defendants devote a substantial portion of their business to producing and selling branded chicken product for multi-unit restaurants like Boston Market.  Defendants' generally refer to their operations that supply Broilers to restaurants as "food service," "fast food," "QSR," "fast casual" or "national accounts."

209.    Beginning at least as early as 2012 and continuing at least into 2017, Defendants engaged in a conspiracy to fix prices and rig bids submitted for Small Bird Broilers sold to restaurants, including Boston Market, with the intent to artificially inflate the prices paid by Boston

Market and others for Small Bird Broilers.

210.    Restaurants like Boston Market purchase Small Bird Broilers for a variety of reasons.  First, there is a perception that Small Birds are more flavorful.  Also, Defendants sell Broiler products by the pound.  To remain competitive in the quick-service and fast-casual food sectors where customers expect value pricing, restaurants generally purchase smaller-sized birds and parts to reduce costs.

211.    Additionally, many restaurants offer chicken sandwich options and thus prefer smaller-sized breast meat that fits on a bun or piece of bread.  Using larger breast meat often requires trimming, which leads to labor inefficiencies and product waste.  Moreover, consistent weight limits are critical to ensuring that meat is properly cooked at the individual restaurants according to standardized food preparation guidelines provided to restaurant staff.

212.    Restaurants like Boston Market serve their proprietary chicken products in multiple locations throughout the country.  To ensure consistency in taste and quality of their products across hundreds of locations spanning multiple states, Boston Market, like many restaurants, negotiates and contracts directly with Defendants for the production and supply of their proprietary chicken according to Boston Market's unique recipes and specifications.

213.    Boston Market provides Defendants with instructions regarding each step of the preparation and packaging process for its chicken products, including the recipe for Boston Market's marinade injection, and specific requirements for packaging and labeling Boston Market products.

214.    It is precisely because the Small Bird Broilers that Defendants manufacture and sell to their restaurant customers are proprietary and unique to their customers' brands that Defendants negotiate and contract directly with restaurants like Boston Market to supply their chicken products.

215.     The contracts between Boston Market and Defendants identify Boston Market as the purchaser or customer, and set forth the agreed formula pricing (as represented by Defendants) and the volume of proprietary chicken products to be sold to Boston Market.

216.     The contracts between Boston Market and Defendants further specify that Boston Market is responsible for all amounts due and owing to Defendants for proprietary Boston Market products.  The agreements also state that should the agreement end, Boston Market must purchase all inventory of finished proprietary items and true up feed expenses purchased at Boston Market's direction.  These provisions are put in place because the proprietary product Defendants produce and sell to Boston Market cannot be sold to any other customer.

217.     As part of its procurement process, Boston Market, like many restaurants, requests proposals or bids from Defendants for the volume of chicken needed to support Boston Market's restaurant system.  Boston Market received bids from Defendants throughout the Conspiracy Period.  Defendants represented to Boston Market that the bids Defendants submitted to Boston Market were based on a pricing formula that purported to take into account various costs, such as Defendants' production expenses (including a feed cost formula based on current corn and soymeal prices), plant costs, overhead, and a per-pound margin.

218.     The formula pricing model Boston Market received from Defendants was updated quarterly, and in some cases monthly, to adjust for feed costs and margins.

219.     Boston Market expected Defendants to engage in a competitive bidding process, which when complete, would allow Boston Market to award its contracts to the most competitive bidder(s).  Defendants, however, recognized that the Small Bird Broiler restaurant market offered an additional opportunity to effectuate their Conspiracy.

220.     Beginning at least as early as 2012, Defendants participated in a scheme to fix prices

and rig bids to Boston Market and other restaurants. Indeed, between 2014 and 2017 alone, Defendants increased Boston Market's prices for Small Bird Broilers across the board in excess of 15 percent. This occurred notwithstanding the historic drop in corn and soybean prices during the same period, which constitute 50 – 70% of Broiler input costs. And, as discussed below, these price increases also occurred at the same time that Small Bird wholesale prices were decreasing significantly. The price-fixing and bid-rigging scheme for Small Bird Broilers continued at least into 2017.

221. Defendants' Small Bird price-fixing and bid-rigging Conspiracy took multiple forms. At its most basic level, Defendants exchanged confidential information with each other regarding the bids they were submitting, or intended to submit, to specific identified restaurant customers like Boston Market, so that all supposedly competitive bids were aligned. In fact, during this period, bid prices submitted to Boston Market by Defendants often were so similar that there was no effective price differential among the bids.

222. Defendants coordinated bids resulted in a dramatic increase in Small Bird Broiler prices to restaurants like Boston Market starting in 2012. This Small Bird price increase occurred even though, according to published industry reports, the number of Small Birds killed increased significantly in 2012 and remained elevated throughout the remainder of the Small Bird Conspiracy Period. This was true, moreover, notwithstanding the supply restriction discussed below that Defendants orchestrated generally for Broilers in the 2011-2012 timeframe.

223. Defendants were able to justify their price increases to restaurant customers like Boston Market through their messaging concerning the supply of Small Bird Broilers. In some instances Defendants threatened to shift production of plants from small birds to larger sized birds claiming profitability concerns, and in other instances Defendants simply misrepresented the

amount of their and the industry's small bird production. Through these coordinated misrepresentations, Defendants were able to persuade restaurant chains like Boston Market to accept higher prices.

224. For example, when Boston Market inquired about the dramatic price increases that Defendants uniformly incorporated in their 2014 bids to Boston Market—and when Defendants maintained these same increases at least until 2017—each of the Defendants that submitted bids to Boston Market gave the exact same explanation: that the price increases were attributable to a shortage of Small Bird Broilers resulting from a supposed reduction of small bird production across the industry.

225. Defendants also pointed their customers to the concomitant increase in Georgia Dock prices—that Defendants themselves manipulated and artificially inflated—as further justification for the Small Bird bid increases. Defendants independently could not have provided Boston Market with the same false explanation for price increases without coordinating prior to submitting bids to Boston Market.

226. Defendants' explanation for the 2014 price increases as purportedly due to a reduction of Small Bird production was false. According to published industry reports, the production of Small Birds in the second half of 2014 actually increased when compared to the first half of 2014. And, the production of small birds continued to increase during 2015 and 2016.

227. In fact, consistent with the increased production of small birds during the 2014-2017 period, the wholesale prices of small birds progressively decreased beginning in the second half of 2014 and continuing through the first half of 2016. The following graph comparing the Urner Barry wholesale price index of small birds with the USDA National Composite price index shows this price decrease. Significantly, however, as discussed below, these wholesale prices

indices did not reflect prices that suppliers charged restaurant customers like Boston Market.



228. Defendants' coordinated explanation to Boston Market and other restaurant chains of their price increases of Small Bird Broilers was part of their collusion to fix prices and rig bids to restaurant chains, including Boston Market, during the Small Bird Conspiracy Period.

229. Then, in 2017—after the reports of the Georgia Dock conspiracy were made public and after the first class action complaints were filed in the Broiler Chicken case—the supposed shortage of Small Bird Broilers suddenly disappeared. Uniformly, Defendants' bids to Boston Market dramatically reduced, although not quite to the level before the beginning of the Small Bird Conspiracy. Yet the actual production of both live and processed pounds of small birds during this period actually *declined* from their amounts in 2016.

230. As a result of the Small Bird Conspiracy, Boston Market was injured in its business or property by paying more for Broilers than it would have paid in the absence of the Conspiracy.

**B.     Defendants' Conspiracy to Restrict the Supply of Broilers**

231.    Defendants' Conspiracy also amounted to a modernized version of the antitrust conspiracy perpetrated in the chicken industry during the 1970s.

232.    The modern-day version of Defendants' Conspiracy was instigated by an attempt by Pilgrim's Pride and Tyson in 2007 to raise industry prices by cutting their production levels. Despite their combined 40% market share, Pilgrim's Pride's and Tyson's 2007 production cuts were not enough to increase prices.

233.    As a result, in January 2008 Pilgrim's Pride and Tyson changed tactics.  Realizing that their actions alone were not enough, they sought broader cooperation to increase Broiler prices. In January 2008, both Pilgrim's Pride and Tyson stated to the Broiler industry that the companies would not continue to cut production.  A few days after attending an industry event in late January 2008, however, Tyson's CEO announced that Tyson had "no choice [but] to raise prices substantially." And, only a day later, a Pilgrim's Pride executive announced publicly that Pilgrim's Pride would be cutting its production and "the rest [] of the market is going to have to pickup a fair share in order for the production to come out of the system."

234.    The other Defendants joined Pilgrim's Pride and Tyson's plan, making substantial cuts to their own production.

235.    Defendants then went even further.  Historically, when faced with low market prices, Defendants relied primarily on short-term production cuts at the middle or end of the supply chain, such as reducing eggs placements, killing newly-hatched chicks, or idling processing plants.  These mechanisms allowed Defendants to increase production within weeks if prices for Broilers subsequently rose.

236.    Here, Defendants purposefully inhibited their ability to ramp up production for 18

months or more by destroying breeder hens in their breeder flocks responsible for supplying the eggs Defendants raise into Broilers.  This destruction of the breeder flocks was unprecedented and the consequences reverberated in the Broiler industry.

237.    Through press releases, earnings and investor calls and at investment bank conferences, events hosted by Agri Stats, and trade association meetings attended by many of their senior-most executives, Defendants preached that oversupply was decimating industry profits, and increased supply-side "discipline" was needed to halt the downward trajectory of prices for Broilers.

238.    Nearly all Defendants were members of the following Broiler industry trade associations: National Chicken Council, United States Poultry & Egg Export Council, U.S. Poultry & Egg Association, Georgia Poultry Federation, North Carolina Poultry Federation, and Poultry Federation (representing Broiler producers in Arkansas, Missouri, and Oklahoma). Participation in these trade associations—regularly by Defendants' top level executives—provided Defendants with opportunities to share information and coordinate the Conspiracy.

239.    Defendants' senior executives participated in numerous investor conferences each year, providing further opportunities to meet and communicate with one another.  Such conferences included the Goldman Sachs Global Staples Forum, Bank of America Merrill Lynch Global Agriculture Conference, BMO Capital Markets Annual Ag & Protein Conference, BMO Capital Markets Conference, BMO Farm to Market Conference, Urner Barry Annual Executive Conference and Marketing Seminar, and JP Morgan Basic Materials Conference.

240.    Defendants also toured competitors' Broiler complexes, which allowed Defendants to obtain confidential business methods employed by their competitors.  While such tours were often framed as "best practices" information exchanges, they also provided Defendants' senior

executives the opportunity to conspire.

241. In January 2008, Defendants attended the International Poultry Expo conference in Atlanta. Over 99.4% of major Broiler producers participated in the conference, including numerous Defendants, their employees, and some of Defendants' senior executives.

242. A few days after attending the conference, both Pilgrim's Pride and Tyson stated to the Broiler industry that the companies would not continue to cut production. Tyson's CEO Dick Bond announced Tyson would be raising prices because "we have no choice [but] to raise prices substantially." Bond's comment does not make sense absent an intention (or knowledge) on his part that Defendants would coordinate an industry-wide reduction in supply, as the commodity nature of Broilers does not allow one producer to successfully raise market prices in the absence of widespread reductions in supply relative to the then-current demand.

243. The next day, Pilgrim's Pride executive Rick Cogdill stated publicly on an earnings call that Pilgrim's Pride had done its part in 2007 by reducing production 5% so "the rest [] of the market is going to have to pick-up a fair share in order for the production to come out of the system." Cogdill explained that Pilgrim's Pride alone could not reduce supply enough to help market prices recover, and that its past efforts to reduce supply had merely led to smaller players increasing their market share at Pilgrim's Pride expense.

244. During the earnings call Cogdill also urged competitors to do their part in reducing Broiler industry supply, stating "[A]ctions are going to have to be taken one way or the other through the industry to pass along these costs . . . [W]e've got to make sure that we get the supply in line with demand at an acceptable price, not just in line with what the customer wants to buy at a cheap price."

245. On a January 31, 2008 earnings call, Sanderson Farms CEO Joe Sanderson explained

that he anticipated the industry would cut production. Specifically, Mr. Sanderson predicted that a production cut was "probable" and "if it's bad and ugly and deep in February, March and April, you'll see the production cuts take place during that period of time. There's still 25% of the industry still making money but I would expect to see those reductions come over the next 90 to 120 days."

246. In March 2008, senior executives from Defendants, including Pilgrim's Pride's newly-installed CEO, Clint Rivers, Tyson Senior Vice President Donnie Smith, Fieldale's President Thomas Hensley, Amick's President and CEO Ben Harrison, and Case Foods CEO Tom Shelton, met at an Executive Committee meeting of the National Chicken Council's Board of Directors in Washington, D.C.

247. Shortly after that meeting, Pilgrim's Pride again urged other producers to cut overall industry supply. Pilgrim's Pride proceeded with the production cuts. On March 12, 2008, Pilgrim's Pride's CEO publicly announced the closure of seven Broiler facilities in order to reduce industry oversupply, stating "we believe [these] actions . . . are absolutely necessary to help bring supply and demand into better balance . . . . That portion of the demand for our products that exists solely at pricing levels below the cost of production is no longer a demand that this industry can continue to supply."

248. Under competitive conditions, other Broiler producers would typically respond to Pilgrim's Pride's substantial supply cuts by increasing their production. However, the other Defendants joined Pilgrim's Pride and Tyson's production reduction Conspiracy.

249. Following Pilgrim's Pride's announcement, a series of production cuts were publicly announced by other Defendants between April 3 and April 11, 2008, specifically:

      a)      On April 3, 2008, Fieldale publicly announced a 5% production cut stating

that "We're hoping this cut puts supply and demand back into better balance." As a privately-held company, there was no reason—other than signaling to fellow producers that it was following through on the Conspiracy—to disclose its production plans.

b)     Simmons publicly announced in a press release a 6% reduction in production throughout its processing plants.

c)     Cagle's Inc. (later acquired by Koch) announced in a press release a 4% reduction in processing of Broilers, noting that the cut "will reduce product being sold through less profitable commodity outlets."

d)     Wayne Farms, O.K. Foods, and Koch each announced 2-8% reductions in production.

250.    Here again, there was no reason—other than to signal to fellow producers that they were following through on the Conspiracy—for these companies to publicly disclose their respective production plans.

251.    Several other Broiler producers cut their production between April 1, 2008 and May 15, 2008, but did not publicly announce their actions. For instance, in May 2008 at a BMO Capital Markets Agriculture & Protein Conference presentation, Sanderson Farms CEO Joe Sanderson stated—in the presence of several competitors including Pilgrim's and Tyson—that he had observed "for the last 6 or 7 weeks . . . some companies in our industry announce cutbacks. . . I know some companies have cut back and have not announced." Such knowledge of non-public production cuts by competitors is highly suggestive of communications among Broiler producers through secret direct communications using Agri Stats as a facilitator.

252.    Beginning in April 2008, the weekly hatchery data started to show declines in egg

sets and chick placements, confirming that Defendants had begun executing their announced intentions to reduce the production of Broilers.

253.    In May 2008, the *Wall Street Journal* noted that conditions in the industry were starting to change: "Three things are making analysts more optimistic: Companies are cutting production, weekly egg-set numbers are declining (egg sets are fertile eggs placed in incubators), and prices are responding positively to the thinning supply lines."  The article also noted "[i]t is unusual for egg sets to decline at this time of year."

254.    Despite the large number of coordinated production cuts (both announced and unannounced) by producers in April 2008, Pilgrim's Pride CEO, Clint Rivers, encouraged further action by the industry at a May 15, 2008, speech at the BMO Capital Markets.  Rivers announced that he hoped to see the Broiler industry continue to cut production to help the industry return to profitability, stating "he would like the industry to trim total production by 3%-4%."

255.    Defendants collectively began making unprecedented cuts at the top of the supply chain in the form of jointly and collusively reducing the supply of "breeder flocks" in the market. Defendants' collective actions effectively eliminated their ability to meaningfully increase Broiler supply for *18 months or more* by destroying breeder hens in their breeder flocks responsible for supplying the eggs Defendants raised into Broilers.

256.    This reduction of industry capacity—particularly at the breeder flock level, where such efforts would be most effective—was a mechanism to increase Defendants' profits. Defendants' efforts were supported by public statements made by their executives in which they expressed their respective commitment to production cuts.  Moreover, many of Defendants' executives' called for a new era of "discipline" by making public statements that deeper production

cuts were an industry-wide imperative that would pay dividends for "the industry" as a whole.[4]

257.    Defendants' public statements on the need for, and benefits of, industry-wide supply "discipline" marked a significant departure from past industry practice.  Notably, a leading industry publication commented in early 2009 that Broiler "production in the U.S. used to be just like government spending, it never went down and cutbacks only resulted in slowing the rate of growth, but not anymore." Yet in 2008, for "the first time in decades, total Broiler production [] remained virtually unchanged from the year before."

258.    In June 2008, during a media conference call involving numerous Broiler industry executives, Mark Hickman, Chairman of the National Chicken Council and CEO of Peco Foods, told participants that "the poultry industry is entering a second phase of production cutbacks, following a 1 percent to 2 percent cutback in production earlier this year."  Mr. Hickman explained that previous cutbacks of Broiler breeder flocks were insufficient, "so liquidation is in round two."

259.    On June 23, 2008, shortly after Peco Foods' CEO publicly suggested that further production cuts were needed, Wayne Farms announced a 6% production cut.  Like many other executives, Wayne Farms President & CEO Elton Maddox cited ethanol subsidies as the reason for the production cuts.  Wayne Farms' announcement came only four days after Peco Foods CEO Hickman suggested further cuts were needed.

260.    On July 2, 2008, Foster Farms announced it was abandoning plans to build a new Broiler plant in northeastern Colorado that it had just announced in April 2008 would employ about

---

[4] While spearheaded by the CEOs and senior personnel of Defendants Tyson and Pilgrim's Pride, public discussion of industry conditions was not limited to the executives of larger, publicly-held Defendants.  For example, Harrison CEO Mike Welch and Sanderson Farms COO Lampkin Butts participated as panelists at a symposium hosted by industry journal WATT PoultryUSA, where the discussion topics included industry consolidation, efficiency, and bird size, with references to information gleaned from Agri Stats (whose Vice President, Mike Donohue, was in the audience).

1,000 people. Foster Farms' CEO, Don Jackson, blamed increased grain and fuel prices as the reason for the company's decision.

261. On July 7, 2008, O.K. Foods announced a 7.5% reduction in egg sets, citing "record high prices for corn and soybean meal, which it attributes to the U.S. government's mandated ethanol policies along with recent flooding in the Midwest 'Corn Belt' region."

262. On August 11, 2008, Pilgrim's Pride announced the closure of its Clinton, Arkansas, processing plant and a facility in Bossier City, Louisiana. Pilgrim's Pride's press release noted the closures "are part of the company's ongoing effort to operate more efficiently and return to profitability amid high feed costs and an oversupply of chicken on the market." The closure of the Clinton processing plant represented an additional 1.25% incremental increase of the company's previously announced production cuts. Pilgrim's Pride stated that it would keep both plants idle until "industry margins can be sustained at more normalized levels of profitability."

263. In August 2008, Raeford announced publicly, as reported by the Charlotte Observer newspaper, that it would begin reducing its Broiler production by 5%. The company said in a statement to industry publication WATT PoultryUSA that "[t]he current obstacles that face our industry require that supply be brought in line with demand." A production cutback was remarkable for Raeford, which had pursued a strategy of aggressive production growth that resulted in the company doubling its Broiler production from 2001 to 2007.

264. On an August 26, 2008, earnings call, Sanderson Farms CEO Joe Sanderson stated that "[s]o long as this weakness continues, the poultry industry will need to cut production further until supply is in line with demand." By September 2008, Broiler industry publication WATT PoultryUSA reported that "[m]ost U.S. chicken integrators ha[d] announced plans to close small operations, consolidate complexes and further processing plants and to reduce output by 3 percent

to 5 percent to 'maximize efficiency.'"

265.    On October 10, 2008, in response to a USDA report of falling egg sets in the Broiler industry, Pilgrim's Pride told the Associated Press that "[t]his is very positive news for the industry and may signal that the industry is taking a more rationalized approach to production heading into the fall."

266.    During the fall of 2008, Sanderson Farms also implemented its previously announced "fall cuts" a month early and delayed the opening of a new deboning facility.

267.    On October 18, 2008, Wayne Farms President & CEO Elton Maddox released a statement announcing the closure of the company's College Park, Georgia plant, resulting in the layoff of over 600 employees.   Maddox cited "changing market conditions" and a need to "maximize efficiencies" as justification for the plant closure.

268.    By December 23, 2008, it was reported that Tyson had cut its production by 5%. Tyson also noted that it had reduced production "in recent years through the closing or sale of poultry plants and by running the company's remaining operations at reduced capacity utilization."

269.    In a February 18, 2009 interview, Tyson Senior Group Vice President Donnie Smith noted that "[a]cross our industry, we're down about six percent versus where we were a year ago. We're seeing an impact from that on market prices . . . the industry fundamentals are improving."

270.    Seeing further cuts from smaller producers in the industry led Pilgrim's Pride to announce historically large cuts to its production in February 2009.   In a press release, Pilgrim's Pride announced the closure of three processing plants located in Douglas, Georgia, El Dorado, Arkansas, and Farmerville, Louisiana, which reduced the total pounds of Broilers it produced by 9-10%.

271.    Overall, "[a]t least 11 companies reported reductions in weekly ready-to-cook

production in 2008," including Defendants Tyson, Pilgrim's Pride, Perdue, Simmons, Raeford, Cagle's (later bought by Koch), George's, O.K. Foods, Harrison, and GNP Company (now owned by Pilgrim's Pride). Other companies reduced their planned production levels or delayed the planned opening of new Broiler complexes.

272. Defendants' production cuts in 2008 and early 2009 did not just reduce the pounds of Broilers they produced. The vertically integrated Defendants had the ability to manipulate supply in the Broiler market at one or more stages of the supply chain. At the top of the supply chain, Defendants could most effectively manipulate supply by reducing the size of breeder flocks, and retiring or killing breeders at an earlier-than-optimum age. Reducing breeder flocks had the most significant and long-lasting effect on supply of Broilers in the market.

273. Because breeder flocks were created from a limited pool of so-called "grandparent" Broilers from one of only three genetics companies (Aviagen, Hubbard, and Tyson's Cobb-Vantress), it takes substantial time—anywhere from six to eighteen months, or more—to re-populate a breeder flock that has been reduced through early culling. While Defendants continued to use their traditional methods to affect their supply-reduction scheme (at the middle or end of the supply chain, such as by reducing eggs placements, killing newly-hatched chicks, or idling processing plants), the Conspiracy was cemented by the long-term effects of breeder flock reductions.

274. Defendants' self-imposed restriction on their ability to ramp up production for years to come by substantially reducing their breeder flocks is shown in the highlighted section of the graph below:



275.    The effect of the supply cuts on Broiler pricing in 2008 and the first months of 2009 was clear—during the worst recession in generations, Broiler prices rose through mid to late 2008, staying at or near all-time highs until late 2009.  For instance, by May 2009, Sanderson Farms reported strong profits that were twice the estimates of Wall Street analysts, which according to one industry publication was "aided by production cuts and lower feed costs that offset still-weak demand."

276.    During 2009 and 2010, Defendants' senior executives continued to meet with one another at trade association meetings and industry events, such as the National Chicken Council and the International Poultry Expo, and encouraged continued "production discipline," Defendants' euphemism for limiting Broiler supply.

277.    As prices continued to rise during late 2009 and early 2010, producers started increasing production in response to the higher prices just as they had done in previous decades. The rising production by producers in early 2010 led to a reported oversupply of Broilers that began to depress prices by late 2010.  Having learned the value of coordinated supply reductions in 2008,

Defendants were quick to react with a new round of publicly announced production cuts in the first half of 2011, which quickly helped prices recover.

278.    Defendants engaged in a second wave of coordinated production cuts in 2011 and 2012 that included further substantial destruction of industry breeder flocks.  Defendants also continued to limit the United States Broiler supply in subsequent years by destroying eggs, relying upon one another's production to meet customer needs, and exporting excess breeder flocks to Mexico—even when doing so was against their independent economic interest.

279.    In addition to limiting its own production, in early 2011 Tyson, embarked on a strategy to absorb the excess supply of its competitors.  Tyson called the strategy "Buy vs. Grow."

280.    Tyson's Buy vs. Grow strategy allowed Tyson to purchase excess production from its competitors to avoid the depression of prices that would occur had the excess production been sold on the open market.  The strategy also served the dual purpose of allowing Tyson to communicate the amount of Broilers it would be willing to purchase from competitors in the current and future months, thereby allowing Tyson's competitors to calculate the amount of product that would *not* be purchased by Tyson and that should therefore be cut.

281.    It would have been cheaper (on a cost per pound basis) for Tyson to grow its own Broilers instead of buying them from a competitor.  But, Tyson engaged in its Buy vs. Grow program because it allowed Tyson to control supply and production in the Broiler industry and reap the benefit of higher market prices for Broilers.

282.    On January 24-26, 2011, Defendants' senior executives, including Tyson CEO Donnie Smith, attended the International Poultry Expo ("IPE") in Atlanta, Georgia. The IPE featured an annual market intelligence panel with Mike Donohue from Agri Stats and industry-insider Paul Aho.  According to one report, Donohue noted that "the broiler industry is currently at

record high weekly slaughter volumes" and Aho warned "[t]his could be a very difficult year with cutbacks, rationalization, and consolidation . . . . The market is calling for around a 5% reduction in chicken production."

283.    On a February 16, 2011 Cagle's[5] earnings call, Cagle's reportedly said it had begun a 20% reduction in production at a deboning operation in an effort to balance supply and demand. Cagle's told one publication that it was "optimistic that the industry will exhibit the production restraint necessary to support higher pricing for Cagle's products allowing for return to profitable margins."

284.    On March 7, 2011, Raeford announced a 10% reduction in egg sets that began in early February.

285.    On March 15, 2011, Simmons announced it was laying off 180 workers at its Siloam Springs, Arkansas processing plant, blaming high grain prices.

286.    On April 15, 2011, Mountaire announced the abandonment of a planned capacity increase. Mountaire's President Paul Downes explained that "the only way to higher prices is less supply. The only way to less supply is chicken companies will shut down or cut back. . . . I think that's what we're going to see."

287.    Downes' view of the state of the Broiler industry was echoed, and amplified, by Sanderson Farms' CEO, who stated on a May 24, 2011 earnings call that "the deal is that the industry . . . cannot sustain losses like they are sustaining for a long period of time . . . The only way to stop losses with $7 corn is to reduce production and get prices up." Sanderson continued, "my judgment is that there will be some others that are going to have to make some adjustments that I believe cuts will be forthcoming in our industry based on the losses we see in Agri Stats."

---

[5] Cagle's is a Georgia-based integrator whose assets were bought by Koch in 2012 following Cagle's bankruptcy.

288.    Sanderson Farms' May 2011 comments came roughly one week after the BMO Farm to Market Conference in New York City. The conference included a presentation during which the CEO of Pilgrim's Pride, Bill Lovette, noted Pilgrim's Pride's new focus on matching production to meet demand, including by adjusting "head," *i.e.*, breeder flocks, to better balance supply and customer demand. Lovette's presentation noted Pilgrim's Pride's shift away from fixed-rate contracts to market-based pricing.

289.    On a June 6, 2011 earnings call, Cagle's said that "the industry must lower supply in order to offset reduced demand and to support higher market prices." Later that month, Cagle's announced it was laying off 300 employees at its Pine Mountain Valley, Georgia plant to reduce Broiler volumes.

290.    In 2011, Mar-Jac reduced its production 10% and reported that other Broiler producers were doing so as well. Fieldale also reduced its production by an unspecified amount.

291.    In June 2011, Tyson began pulling eggs from its incubators to reduce Broiler volumes.

292.    On June 27, 2011, Simmons announced it was laying off 223 employees by August at its Siloam Springs, Arkansas plant to "shift production to better address soaring corn prices."

293.    On July 29, 2011, Pilgrim's Pride announced the closure of its Dallas, Texas processing plant and the layoff of 1,000 employees. Pilgrim's Pride's President & CEO Bill Lovette explained that "we must make better use of our assets given the challenges facing our industry from record-high feed costs and an oversupply of chicken . . . A key component of that effort is improving our capacity utilization through production consolidation and other operational changes."

294.    On an August 1, 2011 earnings call, Sanderson Farms CEO, Joe Sanderson,

informed analysts that the company's normal fall production cut of four percent beginning in November would remain in place beyond January 2012 or until such time as demand improved. Sanderson also stated that it "wouldn't surprise me if the industry makes further, deeper reductions in egg sets in October or November . . . Nobody knows what cuts might be needed until we get to October, but I think that the cutbacks may need to be more than the 6% in head that the industry has in place."

295.    A week later, on August 8, 2011, Tyson's CEO said on an earnings call that "domestic availability must be in balance with demand before industry economics can improve. Tyson continuously strives to match our supply to demand and as a result we made a production adjustment in the third quarter . . .  Our goal is to match supply to demand.  And following over-production the industry experienced, we cut production in the third quarter, but those cuts have not yet impacted the market."

296.    On August 18, 2011, Cagle's announced it was reducing 20% of its production at its large Pine Mountain Valley, Georgia plant.

297.    On September 15, 2011, Case Foods began breaking eggs to reduce its production.  It continued these production cuts into 2012.

298.    In early October 2011, Defendants' senior executives attended the National Chicken Council's Annual Conference in Washington, D.C.  Among the discussion panels at the event was one about the "new paradigm" in the Broiler industry.  The panel included senior executives from Perdue and Koch.  Panelists said that "the industry is accustomed to cycles, but not one quite like the latest, and companies are going to need to adjust.  Discipline on the supply side was one suggestion.  Getting better prices from retailers was another."

299.    On November 17, 2011, Wayne Farms issued a press release announcing the closure

of its Decatur, Alabama plant and layoffs of 360 employees.

300.    In early 2012, Sanderson Farms cut its production by 4%, which included a reduction in breeder flocks.

301.    Throughout 2012, Defendants continued to meet at trade association meetings and industry events, giving them the opportunity to discuss the impact of their collective production cuts and otherwise monitor their Conspiracy.  In the first quarter of 2012, for example, Defendants' top executives attended the National Chicken Council's board of directors meeting in Atlanta, which was held in conjunction with the IPE.  On March 20-21, 2012, the National Chicken Council's board of directors, which included many of Defendants' senior executives, met again in Washington, D.C.

302.    On August 28, 2012, Sanderson Farms announced a further 2% production cut that it blamed on corn and soybean prices.

303.    Defendants' actions, taken collectively and not in isolation, demonstrated an unprecedented level of coordination and industry "production discipline."

304.    Defendants' collective output-restriction caused a slowing in overall Broiler pounds produced during the Conspiracy Period, in sharp contrast to the historic trend of steady annual production increases.  The overall effect is depicted in the graph below, drawn from USDA data, showing that while overall Broiler production grew a total of 21% from 2000 to 2008, it then slowed to a total of roughly 10% from 2008 through 2016:



305.    Indeed, Defendants' cuts to the Broiler breeder flocks in 2011-2012 drove overall Broiler supply flocks down to levels not seen for almost two decades, as reflected in the highlighted section of the following graph.  Yet, at exactly the same time, Defendants' production of Small Bird Broilers increased and continued to increase throughout the Small Bird Conspiracy Period.

56



306.    Even with the overall reduction in Broiler supply, the higher broiler prices in the market by September 2012 were not justified because the costs of Defendants' primary inputs, corn and soybean meal, which by the fourth quarter of 2012 had dropped significantly in price following near-record highs in the summer of 2012.

307.    Defendants adopted multiple additional strategies to strengthen and sustain the Conspiracy.

308.    Defendants directly purchased Broilers from one another and from smaller producers to meet their respective sales needs.  This tactic allowed Defendants to absorb excess supply that could potentially depress market prices.  These inter-Defendant purchases also allowed Defendants to maintain market share.

309.    Additionally, the inter-Defendant sales provided an opportunity for Defendants to discuss prices with competitors.  In many instances large inter-Defendant purchases were negotiated by Defendants' senior level executives, thereby providing additional opportunities to conspire.

310.    Tyson's implementation in 2011 of its "Buy vs. Grow" strategy is a prime example

57

of how inter-Defendant sales were part and parcel of the Conspiracy. Indeed, only a few years prior to adopting the "Buy vs. Grow" strategy, Tyson had derided a similar strategy as a "stupid" subsidization of competitors' growth.

311. In a November 5, 2012 interview, Fieldale's President, Thomas Hensley, noted his company was also pursuing a strategy to purchase excess supply from its competitors, stating that "[i]f you don't have a home for your chickens on Monday morning, you shouldn't have those chickens. Now we know where all our chickens are going. So we are buying chickens in that lower price area instead of selling them."

312. Broiler prices significantly increased during the Conspiracy Period as a result of Defendants' conduct. This is contrary to pricing patterns prior to the Conspiracy Period, and contrary to what would be expected in a competitive market. The rise in Broiler prices relative to input costs led to record profits for Defendants.

### C. Defendants' Collusive Manipulation of the Georgia Dock Price Index

313. Wholesale broiler prices were reported primarily by three entities: Urner Barry (a commodity price reporting service), the GDA, and the USDA. In addition to these reports, Agri Stats also collected detailed pricing information through its subsidiary Express Markets, Inc. ("EMI").[6]

314. The Georgia Dock, USDA Composite, and Urner Barry all measured the same (or very similar) size and grade of Broilers. These three indices set prices for both the "whole bird" and various parts of the Broiler (wings, tenders, leg quarters, thighs, drumsticks and breasts) using the same pricing methodology.

---

[6] EMI was formed around 2000 to compete with the price reporting service of Urner Barry. Unlike Agri Stats' reports for Defendants, EMI released daily pricing data to both Defendants and potential purchasers of Broilers, though the reporting service costs thousands of dollars and was not publicly available. EMI reports captured all transactions by Broiler producers, who automatically transmitted transactional invoice information electronically to EMI.

315.   Urner Barry, a subscription-based report, collected and published daily price information for Broilers.  The USDA's Composite price index published Broiler price information on a weekly basis.  USDA's Composite price index was publicly available at no cost.

316.   The USDA and Urner Barry's Broiler price indices were based upon a system of double verification, which includes telephonic and written surveys of all or nearly all Broiler producers, but also verification of reported prices from purchasers such as brokers and customers. Significantly, however, the reported prices were wholesale prices, and did not include prices that suppliers charged restaurant customers like Boston Market.

317.   The most detailed price report was not publicly available and was produced by Agri Stats and its subsidiary, EMI.  According to a May 2010 FarmEcon study, EMI's pricing report included "pricing data on whole birds and chicken parts that is considerably more detailed than the USDA," Urner Barry, or Georgia Dock reports, as it was based on actual sales invoices from Broiler companies.

318.   Compared to the other two indices available to Broiler purchasers, the Georgia Dock benchmark price index was highly susceptible to manipulation by the Georgia Dock Producers.

319.   Unlike the USDA Composite or Urner Barry indices that used data from numerous producers and buyers on both sides of the market, the Georgia Dock benchmark price was a self-reported number from a handful of producers including the Georgia Dock Producers.

320.   The GDA used the Georgia Dock Producers' price quotes to determine the Georgia Dock index using a formula based on each company's respective market share in Georgia.[7]

321.   In compiling the Georgia Dock benchmark price, there was no team of economists or

---

[7] During the Conspiracy Period, the Georgia Dock Producers' respective Georgia market shares were:  Pilgrim's Pride (33%); Tyson (14%); Fieldale (14%); Perdue (9%); and Sanderson Farms, Koch, Claxton, Mar- Jac, Harrison, and Wayne Farms, each with a 5% market share.

statisticians surveying buyers and sellers in the national Broiler market. To compile the Georgia Dock price index, a GDA employee simply contacted participating Broiler producers each week to collect verbal price quotes, which were supposed to reflect their actual sales prices. A single price was given by each Broiler producer company and it was accepted without any verification of actual invoices or any other form of auditing to verify accuracy.[8]

322. Historically, the Georgia Dock benchmark price was highly correlated to the USDA Composite and Urner Barry indices. However, during the Conspiracy Period, and after at least a decade of high correlation with the USDA Composite and Urner Barry indices, the Georgia Dock's price volatility virtually disappeared.[9] The following graph compares prices of the various indices both before and during the Conspiracy Period, and depicts the Georgia Dock's divergence from the other indices:

---

[8] In response to a press inquiry, the GDA explained its failure to audit any self-reported data from Defendants by stating, "We don't see any reason they would submit information that wasn't truthful."

[9] The USDA Composite and Urner Barry indexes remained positively correlated with each other.



323. The GDA used the "one cent Rule" where outlier prices deviating by more than one cent from the initial dock price were excluded from the final Georgia Dock price. Therefore, the significant difference between the Georgia Dock price index and other Broiler price indices in recent years cannot be explained by only one or two outlier companies reporting artificially high Broiler prices to the GDA. Instead, the deviation of the Georgia Dock price index from other indices can only be attributed to all or nearly all of the Georgia Dock Producers participation in collectively submitting artificially high and nearly identical Broiler prices to the GDA.

324. Despite the GDA's public statements about confidence in the Georgia Dock price index, the GDA employee who collected prices each week from Broiler companies, Arty Schronce, was deeply concerned. In a September 2016 internal GDA memorandum—disclosed publicly for the first time on November 17, 2016 in a *Washington Post* article—Schronce wrote that he "continue[d] to have concerns about" the Georgia Dock, had "voiced concerns in the past," and that he thought the Georgia Dock price index was "a flawed product that is a liability to the Georgia

Department of Agriculture." Schronce also noted, "I was told that poultry companies know what they are doing and all I need to do is to gather and consolidate the info I am provided. However, I have come to question the validity of some of the information provided."

325. Until late 2016, the Georgia Dock pricing methodology was not publicly available. Broiler purchasers, whose transactions with Defendants were based on the Georgia Dock whole-bird price, mistakenly believed it reflected the actual market price of Broilers. Moreover, because (until August 2016) the USDA also published the Georgia Dock benchmark price alongside the USDA Composite, many Broiler purchasers erroneously believed the Georgia Dock price to be a USDA price.

326. The reality was that the Georgia Dock price was simply whatever the Georgia Dock Producers said it was. Hypothetically, if one week the Georgia Dock price was $1.75, and the following week the Georgia Dock Producers told the GDA that the sales price of their Broilers was now $2, the Georgia Dock price was $2—and the prices that purchasers paid for Broilers increased commensurately.

327. Senior executives from eight of the ten companies who participated in the Georgia Dock price submissions were members of a non-public, non-governmental "Georgia Dock Advisory Board," that advised the GDA on the Georgia Dock price.

328. The Advisory Board played a role in the compilation and manipulation of the Georgia Dock benchmark price index. From at least September 2012 through 2016, the Advisory Board included Gus Arrendale (CEO, Fieldale), Mike Welch (CEO and President, Harrison), Jerry Lane (CEO, Claxton), Jayson Penn (EVP Sales and Operations, Pilgrim's Pride), Pete Martin (VP of Operations, Mar-Jac), Vernon Owenby (Manager of Tyson's facility in Cumming, Georgia), Steve Clever (VP of Fresh Sales, Wayne Farms), and Dale Tolbert (VP of Sales, Koch).

329.    The Advisory Board gave the Georgia Dock Producers a vehicle to discuss and artificially set price quotes to ensure compliance with their price-fixing agreement.

330.    The existence and conduct of this Advisory Board was not known to Broiler purchasers until November 2016 when it was first made public following a press report about a September 2016 memorandum written by Schronce that was highly critical of the Georgia Dock methodology.

331.    In December 2015, the GDA began an internal review process of the Georgia Dock pricing methodology, in large part, because the agency had "serious concerns" about the way the index was compiled.  The GDA's internal review was not made public at the time it began, and was not revealed until it was described in a series of press reports beginning in November 2016.

332.    On July 19-20, 2016, high-level USDA officials met with GDA representatives in Atlanta, Georgia to discuss the Georgia Dock price.  The USDA officials shared their conclusion that GDA could no longer simply accept Broiler prices obtained from Defendants and their Co-Conspirators without verification, and instead would have to verify invoice-level data to confirm reported prices.  USDA officials requested that the GDA provide the USDA with data from Broiler producers to "test and review" the Georgia Dock price for accuracy.

333.    In 2016, high-level officials within the GDA began to raise antitrust concerns regarding the Georgia Dock.  For instance, in a July 27, 2016 report, GDA Director of Regulatory Compliance & Budget, Alec Asbridge, concluded that "[t]he top 10 poultry producing companies now control over 80% of the industry output.  The combination of vertical integration, limited competition and lowered production periods has led to steady prices that have shown to be fairly resistant to changing market conditions.  These factors alone illicit [sic] anti-trust review."

334.    On August 5, 2016 a revised and highly sanitized version of the July 27, 2016 report

from Director Asbridge to GDA Commissioner Black was circulated internally at GDA. The sanitized August 5 report removed references to the existence of factors in the Broiler industry eliciting "anti-trust review" and to the fact that the Georgia Dock price was reported for decades by GDA "without regulatory oversight."

335. In the fall of 2016, under pressure from the USDA and realizing that the Georgia Dock pricing methodology raised significant antitrust concerns, the GDA considered revising the methodology. After the Georgia Dock Producers balked at the GDA's new methodology—which required them to verify and attest to the accuracy of their price quotes—the GDA halted the Georgia Dock benchmark price index altogether, citing a "lack of submissions" under the new reporting requirements.

336. In November 2016, following intense scrutiny from the USDA and news media, the GDA suspended reporting the Georgia Dock benchmark price index.

> **D.** **Agri Stats Actively Facilitated Defendants' Conspiracy by Providing Data Necessary to Effectuate, Monitor and Enforce the Conspiracy**
>
> (i) <u>Agri Stats Reports</u>

337. Defendants' Conspiracy was successfully facilitated, monitored, and policed by using reports purchased, at significant cost, from Agri Stats.

338. Every Defendant and Co-Conspirator participated in Agri Stats. Additionally, certain entities acquired by Defendants participated in Agri Stats, including Cagle's, Inc., BC Natural Chicken, Peterson Farms, and Townsend's.

339. Agri Stats described itself as a service that "allows organizations to develop plans on how to adopt best practice, usually with the aim of increasing some aspect of performance."

340. Agri Stats collected detailed, proprietary data from all Defendants, including housing used, breed of chicks, average size, and production and breeder flock levels on a regular

basis, typically weekly. Agri Stats audited and verified the data, and ultimately reported back to Defendants detailed statistics on nearly every operating metric within the industry, including the size and age of breeder flocks.

341. Although certain Defendants purchased information provided by Agri Stats before 2008, the output restriction part of Defendants' Conspiracy began when Tyson—which had stopped using Agri Stats sometime in the wake of a $1.3 billion jury verdict in 2004 against it for a conspiracy to manipulate pay to cattle farmers—became a subscriber again in early 2008, around the start of the Conspiracy Period.

342. Tyson's resubscription in early 2008 resulted in significantly increased fee income to Agri Stats as Tyson was by far the largest and most lucrative subscriber.

343. Agri Stats' survey methodology involved direct electronic data submissions from and to Defendants of financial, production, breeder flock size and age, capacity, cost, and numerous other categories of information by each Broiler producer on a weekly and monthly basis.

344. Each Defendant received numerous types of Agri Stats reports, including separate targeted reports for each major area of operations, such as breeding, hatching, hauling, feeding, processing, selling, and administration. Defendants' top executives received Agri Stats' monthly "Bottom Line" Reports (which, for a period of time was called the "Executive Report") that contained one row for each Broiler company reporting to Agri Stats with columns for certain categories of information, such as operating profit dollars, profit percentage, corporate SG&A (*i.e.*, overhead), interest expense, and other key operational information related to sales, revenues and costs.

345. The information available to Defendants in these Agri Stats reports would not typically be disclosed among competitors in a competitive market. Although the USDA and various

other entities published aggregated weekly, monthly, and annual supply and pricing information concerning the U.S. Broiler industry, Agri Stats was unique in that it contains detailed information to accurately determine producer-specific production, costs, and general efficiency.

346. Agri Stats purported to maintain the confidentiality and anonymity of individual companies' data by giving each company a report identifying only that company's specific Broiler complexes by name. The report would not identify other Broiler producers' complexes by name, but instead would list competitors' complexes by number. Sanderson Farms CEO Joe Sanderson claimed "Agri Stats is a benchmarking service that we submit data to. Almost everyone in our industry does as well. And we get the data back. It's anonymous—the data is anonymous, so we don't know whose numbers the numbers belong to, but we can see performance indicators all over the industry."

347. While the Agri Stats reports superficially "anonymized" individual producer information, they were sufficiently detailed so that any reasonably-informed producer could discern the identity of its competitors' Broiler complexes. For example, Case Foods was able to de-anonymize Agri Stats' bottom line reports and determine its competitors' rankings.

348. Agri Stats reports included facility-level data for over 100 of Defendants' Broiler integrated production facilities. Most of these vast facilities, referred to as "complexes," included housing for Defendants' breeder flocks and hatcheries where breeder flock hens lay the eggs that would ultimately become Broilers.

349. Specifically, Agri Stats' reports identified each complex with unique numbers, including a coding system identifying the region and sub-region, for each Broiler complex, with the cover pages of each sub-regional report identifying by name the companies whose complexes are covered in the report itself. For example, "Region 20" includes "Sub-Region 21 – Upper Mid

Atlantic," identifying, with a unique number, sixteen Broiler complexes, including four Tyson complexes, four Perdue complexes, three Mountaire complexes, two Pilgrim's Pride complexes, and one George's complex.[10]

350.    Agri Stats' coding system made it easy for Defendants' employees—some of whom, including senior executives at both Wayne Farms and Pilgrim's Pride, used to work at Agri Stats—to decipher production, feed, sales and other competitively-sensitive metrics for their competitors' facilities.

351.    In fact, Agri Stats' coding system never changed (*e.g.*, the Tyson complex in Cummings, Georgia has always been identified as complex "222"), meaning that once a Defendant deciphered the numeric code for a given competitor's complex, that Defendant had the ability to know their competitor's data indefinitely.

352.    According to an expert witness for Pilgrim's in contract-farmer litigation against Pilgrim's, "[p]robably no one in the industry would know better than [Agri Stats economist] Mike Donahue [as to whether Broiler production increased in 2008] because EMI is the same company as Agri Stats, which is the company that gathers operating statistics from virtually every company in the broiler industry.  And they know definitively how many breeders are out there, how many pullets are out there, how many broilers are produced every week, and head count and pounds,

---

[10] Agri Stats reports also included specific data for Defendants' Broiler complexes (listed by producer and location) in: North Carolina ("Sub-Region 22"); Northern Georgia and Tennessee ("Sub-Region 31"); Southern Georgia, Florida and South Carolina ("Sub-Region 32"); Alabama and Mississippi (sub-regions 41 and 42); lower Arkansas, Louisiana and Texas ("Sub-Region 51"); upper Arkansas and Missouri ("Sub-Region 52"); Kentucky, Ohio, Minnesota, Indiana and Wisconsin ("Sub-Region 60"); and California and the Pacific Northwest ("Region 10") (which is composed solely of Defendant Foster Farms' three complexes).  While Agri Stats reports were sufficiently detailed such that any reasonably informed producer could discern its competitors' information, Defendant Foster Farms' identity is particularly obvious because Foster Farms is the only producer in its region included in the reports.

everything else. They have massive amounts of statistics. And that's why they're so effective at reporting all of this [production information]."

353. Information helping Defendants assess the size and age of breeder flocks was available in the "Growth Rate Report" section of Agri Stats, which included complex-by-complex numbers showing the average age of the breeder hens whose eggs, when hatched, become Broilers. This data showed how close a given breeder flock is to the end of its egg-laying lifespan, giving Defendants insight into how much longer that flock's capacity to lay eggs will impact the supply of Broilers available for slaughter further down the supply chain. In addition, because the "Growth Rate Report" was available each month, knowing the average age of a given flock from month to month helped Defendants determine when flocks are being slaughtered and removed from the supply chain.

354. Similarly, in some reports, Agri Stats showed the number of egg-laying hens, or pullets, that a competitor is placing on farms. This largely determined the number of eggs that would be laid, and therefore how many Broilers would be hatched and grown – a key marker of future production.

355. Other sections of Agri Stats reports included similar, sub-region data for a range of competitively sensitive metrics, such as bird age and mortality, "chick cost per settled flock," and "grower expense." Knowing the number of complexes each Defendant operated in each sub-region allowed Defendants to assess the performance of all competing complexes in a sub-region on a variety of important industry metrics.

356. When given access to Agri Stats' reports in connection with litigation where he served as an expert witness, an agricultural economist expressed his "shock[] at the incredible detail" of the information presented in the reports.

357.    Thus Agri Stats facilitated Defendants' access to "massive amounts" of each other's competitively sensitive information, including detailed information concerning their competitors' breeder flocks, and other production, capacity, feed, sales, and cost data.

358.    Defendants knew that when they provided internal, confidential information to Agri Stats, other subscriber producers would be able to access that information and identify the Defendant that submitted it.

359.    Providing such specific, commercially-sensitive information to Agri Stats, in conjunction with Agri Stats' dissemination of the information in a manner where producers can identify each competitor's data, constituted an unreasonable, anticompetitive restraint of trade.

(ii)    The Confidential Nature of Agri Stats Reports

360.    Agri Stats' reports were not publicly available and Defendants closely guarded from those outside the industry the reports' contents and the degree of Defendants' participation in Agri Stats' data-gathering and data-dissemination processes.

361.    While Agri Stats reports were closely guarded by Defendants, after an extensive investigation, Boston Market believes that Agri Stats reports included at a minimum the following categories of information:

a) Name of genetics company used for primary breeder stock;

b) Hatchery capacity, costs, and age of Broiler breeder flocks;

c) Feed Manufacturing, Delivery and Formulation data, including corn and soybean meal costs;

d) Growout information for Broiler "flocks" provided to contract farmers, including the number of Broilers placed, chick mortality by week and overall percentage, chick cost, days between flocks provided to contract farmers (aka, "down time"), feed conversion rate (pounds of feed per pound of Broiler), average daily weight gain by chicks, live pounds produced per square foot of grower house, grower compensation, including average grower payment in cents per pound and cents per square foot, breed composition of flock (breed or cross-breed of flocks), detailed information on

69

numerous mechanical aspects of Broiler housing, and numerous other detailed cost, mortality, and operational information about disease, transportation, labor, and other grow out related information;

e) Slaughter, processing, and further processing information, including pay for processing plant workers, total production volume, market age of Broilers at slaughter, weight of Broilers at slaughter, birds per man hour, processing line speeds, and labor hours per pound;

f) Inventory levels of Broilers;

g) Sales data for finished product form and type, such as type of cut (whole bird, cut-up, deboned), various packaging forms (such as bulk, tray pack, etc.), and data segmented into various categories (such as exports, retail, foodservice, etc.); and

h) Financial information, such as monthly operating profit per live pound, sales per live pound, and cost per live pound.

362. Portions of Agri Stats' reports have found their way into the public record. One such instance is a presentation by Dr. Steve Bolen, an executive with Cobb-Vantress, a bird genetics company wholly-owned by Tyson Foods, Inc., in which Dr. Bolen disclosed a portion of an Agri Stats report illustrated below:

## Agristats Boneless Breast Yield



*[Table image — "BONELESS BREAST W/O SKIN YIELD – ADJ FOR CONDIMENTS", Jun 2, 2014 – 13:39, Page: 3.B-1; contents not legibly transcribable.]*

363.     The above table includes data from Broiler production complexes, which are typically located within a 50-mile radius of a Broiler company's feed mill and processing plant. The table contains data for a single month – March 2014. The report provided the various yields of the Defendants' facilities for various cuts of meat (breast, fillets and tenders).

364.     Defendants rarely mentioned their exchange of proprietary information with one another through Agri Stats. However, on occasion (such as during earnings or investor conference calls) Defendants have provided glimpses into their use of Agri Stats information.

365.     For example, in May 2008, Sanderson Farms reported "every year we review our operations and every facet within Agristats. . . we set operational goals every year . . . and [we] try to improve our operations within this benchmarking service we call Agristats."

71

366.    In December 2009, Sanderson Farms CEO Joe Sanderson commented "based on what I see in Agr[i] stats nobody is planning on . . . ramping up.  I see a lot of information from Agr[i] stats that tells me that nobody is going to ramp up."

367.    In May 2011, Mr. Sanderson stated on an earnings call, "my judgment is that there will be some others that are going to have to make some adjustments that I believe cuts will be forthcoming in our industry based on the losses we see in Agri Stats."  Sanderson also stated that he felt "confident that we are going to see cutbacks" based on Agri Stats data.  Sanderson also explained "[t]ypically in my experience the first cut is not enough and you go back and look at 2008, I think the industry started cutting back maybe in June and that cut back was not enough and then they made another cut in the late fall and I believe the industry became profitable in January."

368.    Tyson noted in a December 2014 investor presentation that "when you talk about the chicken cycle, most people will look at the cyclicality.  It's very profitable right now.  And we will not hit the top of the top, because within the profitability segmentation right now, the most profitable segments are in fact big bird, and secondly, tray pack.  We can tell that through Agri Stats.  Now at the same time, when there is more poultry available and the industry may not be as profitable, we would not expect to be anywhere close to what the bottom of that cycle would be."

(iii)    Agri Stats Allowed Defendants to Monitor Competitors to Prevent Cheating

369.    Agri Stats' critical importance to the Conspiracy lies not only in the fact that it supplied data necessary for Defendants to coordinate production limitations and manipulate prices, but also in its market-stabilizing power.  Price-fixing or output-restricting conspiracies, regardless of industry, are subject to inherent instability in the absence of policing mechanisms.  This is true because each individual member of the Conspiracy has the incentive to "cheat" other group members—for example, by boosting Broiler production to capture higher prices even as other producers heed their conspiratorial duty to limit production.

370.    Agri Stats knowingly participated in the producer Defendants' policing efforts.  The specific type or size of breeder flock housing, breed of chick, average bird size, and production levels listed in Agri Stats data for Defendants' complexes aided Defendants in determining which complexes are cutting back, and by how much.

371.    For example, if in January a Defendant publicly stated its intention to reduce production, its competitors would be able to tell from the February and March Agri Stats reports whether that Defendant was following through on its conspiratorial agreement.  Additionally, Defendants Tyson, Pilgrim's Pride, and Sanderson are public companies that reported aggregated data publicly, which competitors could use to match up against the detailed information in the Agri Stats reports in order to identify other specific data from their competitors.

372.    Such detailed statistics—coupled with their regular, in-person meetings with one another, and routine participation in trade association events widely attended by Defendants' senior executives—allowed Defendants to monitor each other's production figures for any signs of "cheating."

(iv)    Agri Stats Meetings & Conferences

373.    Agri Stats' role in the Broiler industry Conspiracy extended beyond the collection and dissemination of competitively-sensitive data.  It was also an active and knowing participant in, and facilitator of, the Conspiracy.

374.    Agri Stats held regular meetings with each Defendant, which allowed Agri Stats to share non-public, proprietary production information with Defendants.  For example, during the Conspiracy Period, Tyson personnel working at complexes in the Mid-Atlantic region were advised by their complex managers about competitors' non-public production information following quarterly meetings between the Tyson complex managers and Agri Stats account managers.

375.    The regular Agri Stats meetings took place at both the production-plant level, where Agri Stats personnel met with Defendants' complex managers, and at the executive level, where Agri Stats personnel met with the leadership of Defendants' hatchery, breeder and feed departments.

376.    During the meeting with Defendants' executives, Agri Stats led detailed discussions about industry profitability and the key contributing factors, including size and average age of Broiler breeder flocks, average hatchability of eggs, mortality rates, average bird rate, feed cost, and other performance factors based on data Defendants provided.  Agri Stats also led discussions about the overall profit of the company and industry, including rankings of companies, overall industry average, and the top and bottom third of the industry.  Agri Stats also told Defendants' executives how much the industry was over- or under-supplying the market and estimated demand, and shared other information based on data Defendants provided.

377.    Agri Stats' employees also confirmed production data for Defendants at the numerous trade association meetings where Agri Stats executives present on a regular basis.  For example, mid-level Tyson personnel working at complexes in the Mid-Atlantic region were advised by their complex managers about competitors' production following quarterly meetings between the Tyson complex managers and Agri Stats account managers.

378.    For each of their Defendant customers, Agri Stats account managers created a series of data compilations known as "books," based on the competitively-sensitive data that a particular Defendant had submitted to Agri Stats.  Agri Stats maintained at least six "books" for each Defendant: (1) the light-blue "Live" book, with information on the Defendant's breeders, hatchery feed and grow-out; (2) the red "Sales" book, with information on the Defendant's current and year-to-date sales; (3) the light-green "Production" book, with information on the Defendant's yields; (4)

the brown "Profit" book, with information on the Defendant's profits and losses; (5) the mustard-yellow "Rendering" book, with information on the Defendant's rendering facilities; and (6) the "Bottom Line" book, with information on the totality of the Defendant's sales, revenues and costs.

379.    On a number of occasions, Agri Stats personnel sent copies of one Defendant's "books" to other Defendants.

380.    Agri Stats also held regular "poultry outlook conferences" for meat industry executives.  Agri Stats employees, including Vice President Michael Donohue and account managers Paul Austin, Paul Bunting and Dana Weatherford, regularly hosted, or presented at, Broiler industry events and investor conferences.  For instance, Agri Stats hosted an April 23, 2015 conference in Atlanta, Georgia which included a presentation by Agri Stats Vice President Sue Trudell concerning the "broiler market situation and outlook," as well as an analysis of feed and macroeconomic factors.  Such presentations were restricted from circulation and were not publicly available outside the invited participants to the poultry outlook conference hosted by EMI.

381.    Sanderson Farms also invited Agri Stats employees to make presentations about the industry to Sanderson's own investors.  One such presentation was made by Agri Stats Vice President Sue Trudell on October 18, 2013.

382.    EMI also held regular invitation-only "Analytics Web Conference" calls.

(v)    Agri Stats Encouraged Defendants' Collusive Behavior

383.    In many instances, Agri Stats played the role of industry cheerleader rather than industry benchmarking service, with Agri Stats suggesting specifically how much Broiler production should be cut based on Agri Stats data.

384.    July 2012 trial testimony in a lawsuit against Pilgrim's by contract farmers revealed that a November 2008 Agri Stats report "made statements to the effect that it thought the industry was 5-percent oversupplied . . . relative . . . to demand."

385.    Agri Stats' Vice President Donohue also frequently appeared at industry events, such as the Spring 2011 IPE conference.  Donohue provided comments as part of an annual "market intelligence" forum about various industry performance metrics.  Additionally, Donohue's co-panelist, Broiler industry insider Paul Aho, explicitly suggested "[t]he market is calling for around a 5% reduction in chicken production" in order for producers to achieve higher prices in 2011.

386.    Donohue also authored articles for the Agri Stats publication EMI Vital Signs.  For instance, the sole "sample" publication available on EMI's website is a May 2013 article in EMI Vital Signs by Donohue, which analyzed whether Broiler producers could continue to achieve high profit levels.  Donohue carefully analyzed Agri Stats data concerning pricing, inventory, and production levels, ultimately concluding "[w]hen supply and demand factors are in good shape the industry can get a good return on investment and for the short and medium term it appears that there is certainly room for optimism in these factors."

387.    Donohue helped forecast supply and demand for the Broiler industry by using Agri Stats data on breeder placements and inventory.  At the US Poultry & Egg Association's Hatchery-Breeder Clinic in January 2012, Donohue noted that chicken breast prices were at a particularly high level and "[i]t's not just cutbacks in production that have already occurred but seasonal demand later this year which may set the industry up for an even better first half of 2012." Donahue further commented "I hope this carries over into the latter half of 2012 based on some of the production forecasts that can be made based on breeder placements and inventories."  Donahue also noted a concern that "if the industry chose to do so, it could ramp up production within a 10-week period of time.  The industry could blow apart any recover[y] in the short term by filling up incubators again," but noted that Agri Stats data indicates the industry was managing its production carefully.

(vi)     Agri Stats Served as a Vehicle for Collusion

388.   Defendants' use of Agri Stats to secretly share detailed, highly confidential and proprietary information about their breeder flock size and age, pricing, capacity, production, and costs constitutes an unreasonable and anticompetitive restraint of trade.  In a competitive market, such proprietary, competitively sensitive information should be a closely guarded secret.

389.   Defendants exchanged de-anonymized Agri Stats information and reports with one other, identifying for their competitors which data pertained to their respective companies.

390.   The FTC's and DOJ's 2000 Guidelines For Collaborations Among Competitors ("FTC/DOJ Guidelines") suggest that Agri Stats is far outside the scope of permissible information sharing among competitors.  The FTC/DOJ Guidelines note the high risk of antitrust issues for information sharing programs in industries with a history of collusion.

391.   The more competitively sensitive the information being shared, the higher the antitrust concern for such information sharing.  Upon information and belief, the weekly and monthly Agri Stats reports included dozens of categories of detailed information that in a competitive industry would be considered trade secrets.  The competitive sensitivity of Agri Stats' reports suggests a particularly high level of antitrust concern.

392.   Moreover, Agri Stats reports were issued weekly and/or monthly, and its EMI reports were issued daily, so as to provide nearly current production, sales, and other data to Defendants.  The nature of Broiler breeder flocks is that they predict future Broiler supply.  By sharing such information in a way that permits company-by-company identification, Defendants were in fact sharing future anticipated production information with one another, which clearly causes high antitrust concern.

393.   The FTC/DOJ Guidelines also provide a "safety zone" (i.e., presumptively permissible) for collaborations among competitors that account for no more than 20% of each

relevant market in which competition may be affected. Here, Defendants account for approximately 90-95% of Broiler production.

394.    One Broiler industry expert testified in a case brought by contract farmers against Broiler producers that the sharing of information through Agri Stats by Broiler producers regarding pay for contract-farmers creates "a potential vehicle for collusion" and presents a "classical antitrust concern."  The same expert also remarked that Agri Stats was unusual even among other price surveys, noting "[t]he sharing of price and other market information by so-called competitors is well known as a significant antitrust issue.  Grower payout and cost information shared by most integrators is incredibly detailed and comprehensive.  As such it could provide critical data for competition investigations and analyses of oligopoly and oligopsonistic behavior far more complex and advanced than available for any other agricultural industry.  An intensive inquiry is needed."

395.    A sworn declaration from a poultry and egg industry expert in Freedom of Information Act litigation seeking disclosure of competitively-sensitive FDA egg-farm reports stated, with respect to Agri Stats, that:

> Individual disclosure is not required when industry participants are familiar enough with the industry to connect the information supplied with the individual companies at issue.  My experience is that competitors . . . are prolific at quantifying their competitor's business information on their own.  For example, industry processors share commercial data through companies such as AGRISTATS (Fort Wayne, IN), a shared business database company . . . started for the poultry industry in 1985. AGRISTATS has the following mission statement: "IMPROVE THE BOTTOM LINE PROFITABILITY FOR OUR PARTICIPANTS BY PROVIDING ACCURATE AND TIMELY COMPARATIVE DATA WHILE PRESERVING THE CONFIDENTIALITY OF INDIVIDUAL COMPANIES."  Note the mission is to share comparative data while protecting individual companies.  I can speak personally that I have seen and read these broiler industry reports, and, based on my familiarity with the industry, I can easily connect the information supplied with the individual companies whose confidentiality is supposedly preserved.  Therefore, it is my opinion that virtually everyone in the industry can connect the information supplied in AGRISTATS with the individual companies who supplied the data.

396.    A 2017 *Bloomberg News* article titled "Is the Chicken Industry Rigged? Inside Agri

Stats, the Poultry Business's Secretive Info-Sharing Service," highlighted the role Agri Stats played in Defendants' efforts to monitor and police their conspiratorial activity:

> Peter Carstensen, a law professor at the University of Wisconsin and former Justice Department antitrust lawyer who has studied Agri Stats while researching the modern poultry industry, casts the level of plant-by-plant detail in the company's reports as "unusual." He explains that information-sharing services in other industries tend to deal in averaged-out aggregated data – for example, insurance rates in a given state. Such services run afoul of antitrust law, he says, when they offer projections or provide data so detailed that no competitor would reasonably share it with another. Getting detailed information is a particularly useful form of collusion, Carstensen says, because it allows co-conspirators to make sure they're all following through on the agreement. "This is one of the ways you do it. You make sure that your co-conspirators have the kind of information that gives them confidence – so they can trust you, that you're not cheating on them," he says. "That is what creates stability for a cartel."

## VIII. PLAINTIFF'S CLAIMS ARE TIMELY

### A. Boston Market Did Not, and Could Not, Discover the Conspiracy Until 2016 or Later

397. Boston Market did not have actual or constructive knowledge of, and could not have discovered, Defendants Conspiracy to restrict the supply of Broilers and to manipulate the Georgia Dock price index until approximately 2016 at the earliest. Boston Market did not have actual or constructive knowledge of, and could not have discovered, Defendants Small Bird Conspiracy until June of 2020 when the Department of Justice issued its Indictment.

398. Throughout the Conspiracy Period, Defendants effectively, affirmatively, and fraudulently concealed their unlawful Conspiracy to fix Broiler prices from Boston Market through various means, including: (1) non-public meetings; (2) surreptitious communications between Defendants via electronic communications and in-person meetings at trade association meetings (and elsewhere); (3) limiting any explicit reference to competitor pricing or supply restraint communications in documents; (4) communicating competitively sensitive data to one another through Agri Stats, a "proprietary, privileged, and confidential" system that kept both the content

and participants in the system secret; and (5) keeping the existence and nature of their competitor supply restraint and price discussions from non-conspirators (including customers).

399.    Moreover, Defendants used code words including "capacity discipline" in their public statements to signal one other in furtherance of their Conspiracy to restrain production while shielding their Conspiracy from detection by the public.

400.    Defendants also used pretexts to conceal the Conspiracy.  Defendants affirmatively and falsely attributed rising prices during the Conspiracy Period to, among other things, increases in the price of inputs costs.  However, the price increases were actually the result of Defendants' collusive and clandestine conduct.

401.    During the Conspiracy Period, Defendants affirmatively made numerous misleading public statements falsely portraying the market for Broilers as a competitive one.

402.    By virtue of Defendants actively and intentionally concealing their above-described wrongful conduct, the running of any applicable statute of limitations has been (and continues to be) tolled and suspended with respect to Boston Market's claims and causes of action resulting from Defendants' unlawful combination and Conspiracy under the fraudulent concealment doctrine and/or doctrine of equitable estoppel.

403.    With respect to the manipulation of the Georgia Dock, a January 18, 2016 *Wall Street Journal* article regarding Defendants' possible manipulation of the Georgia Dock benchmark price raised the possibility of collusion to artificially raise, fix, or maintain Broiler prices using the Georgia Dock.  Subsequently, a series of articles in various publications published between November 3 and 17, 2016, detailed for the first time that the USDA had discontinued its reliance on the Georgia Dock benchmark price because its input prices could not be verified.

404.    Yet even when faced with these public revelations, Defendants continued to assert

the fairness and reliability of the Georgia Dock benchmark price. Not until November 2016 was it disclosed publicly that the Georgia Dock Producers had formed a secret Georgia Dock Advisory Board that facilitated opportunities for executives to meet and also discuss their scheme to fix the Georgia Dock benchmark price, or that the Florida Attorney General's Office was investigating the Georgia Dock benchmark price and its calculation and manipulation by the Georgia Dock Producers. Accordingly, a reasonable person under the circumstances would not have been alerted to begin investigating the legitimacy of Defendants' Broiler prices before these recent events.

405. The November 2016 disclosure of Defendants' conduct was precipitated by the following series of events. From late 2014 into 2016, Broiler input costs fell significantly. Economic theory predicts that in a competitive market, all else being equal, Broiler prices similarly would fall. However, Broiler prices remained artificially inflated due to Defendants' agreement to artificially restrict production and their manipulation of the Georgia Dock Broiler price index, published by the GDA. In November 2016, it became public that the United States Department of Agriculture ("USDA") had requested in July 2016 that the GDA investigate and verify the accuracy of the Broiler prices provided to the GDA by several Defendants. When the GDA declined to do so—citing the industry's and its own lack of interest in verifying prices— USDA began publishing its own Broiler price statistics.

406. Boston Market's claims based on Defendants' supply restrictions and manipulation of the Georgia Dock price index were tolled under *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974), and related authorities during the pendency of direct and indirect purchaser class actions asserted against Defendants, commencing as early as September 2, 2016.

407. The statute of limitations relevant to Boston Market's claims have also been tolled as a result of the criminal indictment filed by the Department of Justice in June 2020.

## IX.      ANTITRUST IMPACT

408.    Defendants' Conspiracy, including the Small Bird Conspiracy, had the following effects, among others:

a)      Price competition was restrained, suppressed and/or eliminated with respect to Broilers;

b)      The supply of Broilers was artificially restrained, manipulated and/or suppressed;

c)      The prices of Broilers were fixed, raised, stabilized or maintained at artificially inflated levels; and

d)      Purchasers of Broilers have been deprived of free and open competition among Defendants.

409.    During the Conspiracy Period, Boston Market purchased Broilers from certain Defendants, their subsidiaries and affiliates, and entities owned or controlled by Defendants or Defendants' subsidiaries and affiliates.  As a direct and proximate result of Defendants' above-described illegal conduct, Boston Market was compelled to pay, and did pay, artificially inflated prices for Broilers than would have prevailed in a competitive market.  Boston Market sustained substantial losses and damage to its businesses and property in the form of overcharges for Broilers. The full amount and forms and components of such damages will be calculated after discovery and presented upon proof at trial.

## X.     CLAIMS FOR RELIEF AND CAUSES OF ACTION

<u>**COUNT I**</u>
**Violation of Section 1 of the Sherman Act**
**15 U.S.C. § 1**

410.     Boston Market incorporates paragraphs 1 through 409 above as if fully set forth herein.

411.     Defendants and their Co-Conspirators entered into and engaged in a combination or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

412.     Defendants' anticompetitive and unlawful acts in furtherance of the Conspiracy were authorized, ordered or executed by their respective directors, officers, agents, employees or representatives, within the course and scope of their duties and employment, or with Defendants' actual, apparent or ostensible authority.

413.     At least as early as January 1, 2008, and continuing until at least as late as 2017, the exact dates being unknown to Boston Market, Defendants entered into a continuing agreement, understanding and conspiracy in restraint of trade to fix, raise, stabilize, and maintain prices for and/or restrain supply of Broilers, and rig bids and allocate markets for Small Birds, thereby creating anticompetitive effects.

414.     The conspiratorial acts and combinations have caused unreasonable restraints in the market for Broilers.

415.     As a result of Defendants' unlawful conduct, Boston Market was harmed because it was forced to pay inflated, supracompetitive prices for Broilers.

416.     In formulating and carrying out the alleged agreement, understanding and conspiracy, Defendants did those things that they combined and conspired to do, including but not

limited to the acts, practices and course of conduct set forth in this Complaint. Defendants' Conspiracy had the following effects, among others:

- Price competition in the market for Broilers was restrained, suppressed and/or eliminated in the United States;

- The supply of Broilers was restrained, manipulated and/or suppressed in the United States;

- Prices for Broilers sold by Defendants, their divisions, subsidiaries, and affiliates and all of their Co-Conspirators were fixed, raised, stabilized, and maintained at artificially high, non-competitive levels throughout the United States; and

- Boston Market directly purchased Broilers from Defendants and their Co-Conspirators. Boston Market and its divisions, subsidiaries, and affiliates, were therefore deprived of the benefits of free and open competition in the purchase of Broilers.

417. Defendants took all of the actions alleged in this Complaint with the knowledge and intended effect that their actions would proximately cause the price of Broilers to be higher than they would be but for Defendants' conduct. Defendants also knew and intended that such an artificial inflation of Broiler prices would cause Boston Market to pay higher prices for Broilers.

418. Defendants also knew and intended that the coordinated increase in bids submitted to Boston Market—and their coordinated false explanation for the increase—would increase the prices paid by Boston Market.

419. As a direct and proximate result of Defendants' anticompetitive conduct, Boston Market was injured in its business or property and will continue to be injured in its business and

property by paying more for Broilers than it would have paid and will pay in the absence of the Conspiracy.

420.    The alleged contract, combination, or conspiracy is a *per se* violation of the federal antitrust laws.

## COUNT II
### Violation of Arizona's Uniform State Antitrust Act, Ariz. Rev. Stat. § 44-1401, *et seq.*

421.    Boston Market incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

422.    During the Conspiracy Period, Boston Market conducted a substantial volume of business in the State of Arizona and was registered to do business in Arizona.  During the Conspiracy Period, Boston Market submitted purchase orders for all shipments of Broilers it received at store locations in Arizona from its locations in Arizona. As a result of Defendants' Conspiracy, Boston Market took delivery of Broilers at artificially inflated prices at its store locations in Arizona.

423.    During the Conspiracy Period, Boston Market purchased Broilers from Defendants, directly and through its vendors, for use in food preparation in Boston Market's Arizona locations, and not for resale in unaltered form.  Boston Market then sold prepared chicken meals to customers in Arizona.

424.    As a result of Boston Market's presence in Arizona and the substantial business it conducted in Arizona—including the submission of purchase orders for, receiving invoices for, and receiving shipment of Broilers in Arizona—Boston Market is entitled to the protection of the laws of Arizona.

425.     By reason of the conduct alleged herein, Defendants have violated Arizona Rev.

Stat. § 44-1401, *et seq*. Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of, trade or commerce in the Broilers market, substantial part of which occurred within Arizona.

426. Defendants' Conspiracy, a substantial part of which occurred within Arizona, was for the purpose of excluding competition or controlling, fixing, or maintaining prices in the Broiler market.

427. Defendants' violations of Arizona law were flagrant. Defendants' unlawful conduct substantially affected Arizona's trade and commerce.

428. As a direct and proximate cause of Defendants' unlawful conduct, Boston Market has been injured in its business or property and is threatened with further injury. Plaintiffs therefore are entitled to seek all forms of relief available under Arizona Revised Statute § 44-1401, *et seq*.

429. In accordance with the requirements of Ariz. Rev. Stat. § 44-1415(A), notice of this action was mailed to the Arizona Attorney General by Boston Market and proof of service has been filed with the Court.

### COUNT III
### Violation of California's Cartwright Act,
### Cal. Bus. & Prof. Code § 16700, *et seq*.

430. Boston Market incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

431. During the Conspiracy Period, Boston Market conducted a substantial volume of business in the State of California and was registered to do business in California. As a result of Defendants' Conspiracy, Boston Market submitted purchase orders for, received shipments of, and took delivery of Broilers at artificially inflated prices at Boston Market restaurants in California.

432. During the Conspiracy Period, Boston Market submitted purchase orders for all

shipments of Broilers it received at store locations in California from its locations in California. As a result of Defendants' Conspiracy, Boston Market took delivery of Broilers at artificially inflated prices at its store locations in California.

433. During the Conspiracy Period, Boston Market purchased Broilers from Defendants, directly and through its vendors, for use in food preparation in Boston Market's California locations, and not for resale in unaltered form. Boston Market then sold prepared chicken meals to customers in California.

434. As are result of Boston Market's presence in California——including the submission of purchase orders for, receiving invoices for, and receiving shipment of Broilers in California— Boston Market is entitled to the protection of the laws of California under California Business & Professional Code §§ 16700-16770.

435. During the Conspiracy Period, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of the Cartwright Act, Cal. Bus. & Prof. Code § 16720. Defendants have acted in violation of Section 16720 to fix, raise, stabilize, and maintain prices of, and rig bids and allocated markets for Broilers at supra-competitive levels. Defendants knew or should have known that their Conspiracy to fix prices and rig bids for Broilers would cause prices for Broilers to rise. Defendants' conduct substantially affected California commerce.

436. The abovementioned violations of Cal. Bus. & Prof. Code § 16720 consisted, without limitation, of a continuing unlawful trust and concert of action among Defendants and their co-conspirators, the substantial terms of which were to rig the bids for, and fix, raise, maintain and stabilize the prices of, and to allocate markets for, Broilers.

437. For the purpose of forming and effectuating the unlawful trust, Defendants and their

co-conspirators have done those things that they combined and conspired to do, including but in no way limited to the acts, practices, and course of conduct set forth above and the following:

a) Participating in meetings and conversations, in California and elsewhere, to fix, raise, maintain, and/or stabilize the price of Broilers;

b) Communicating in writing, in California and elsewhere, to fix, raise, maintain, and/or stabilize the price of Broilers sold to Boston Market in California;

c) Restricting the supply of Broilers in order to artificially inflate the price of Broilers sold to Boston Market in California;

d) Issuing price announcements in California and elsewhere, in accordance with illegal conspiratorial conduct that inflated the price of Broilers sold to Boston Market it California;

e) Negotiating and entering into agreements with Boston Market to sell Broilers to Boston Market in California at artificially inflated prices;

f) Selling Broilers to Boston Market and/or its vendors in California at artificially inflated prices;

g) Exchanging information, in California and elsewhere, on bids for Broilers sold to Boston Market and its vendors for the purpose of monitoring and enforcing adherence to illegal agreements;

h) Providing false statements to Boston Market, in California and elsewhere, to explain increased bids and prices for Broilers sold to Boston Market in California;

i) Fixing, raising, maintaining, and stabilizing the price of Broilers sold to Boston Market in California;

j) Allocating markets for Broilers amongst themselves; and

k) Submitting rigged bids for the award and performance of certain Broiler

88

contracts, including contracts with Boston Market for the sale and delivery of Broilers to Boston Market in California.

438.    The combination and Conspiracy alleged herein has had, inter alia, the following effects:

a)    Price competition in the sale of Broilers has been restrained, suppressed, and/or eliminated in the State of California;

b)    Prices for Broilers sold by Defendants, their co-conspirators, and others have been fixed, raised, maintained, and stabilized at artificially high, non-competitive levels in the State of California; and

c)    Boston Market, who purchased Broilers from Defendants, their co-conspirators, and others have been deprived of the benefit of free and open competition.

439.    As a direct and proximate result of the alleged unlawful conduct of Defendants, Boston Market paid supra-competitive, artificially inflated prices for the Broilers it purchased during the Conspiracy Period.  But for Defendants' conduct set forth herein, the price of Broilers would have been lower.

440.    As a direct and proximate result of Defendants' conduct, Boston Market has been injured in its business and property by paying more for Broilers sold by Defendants, their co-conspirators, and others than they would have paid in the absence of Defendants' combination and Conspiracy.  As a result of Defendants' violation of Section 16720 of the California Business and Professional Code, Boston Market is entitled to treble damages and the costs of suit, including reasonable attorneys' fees, pursuant to Section 16750(a) of the California Business and Professional Code.

## COUNT IV
### Violation of California Unfair Competition Law ("UCL")
### Cal. Bus. & Prof. Code § 17200 *et seq*.,

441.    Boston Market incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

442.    Defendants have engaged in unfair competition in violation of California's Unfair Competition Law, California Business and Professional Code § 17200 *et seq*., by engaging in the acts or practices specified above.

443.    This Complaint is filed, and these proceedings are pursuant to Sections 17203 and 17204 of the California Business & Professions Code, to obtain restitution from Defendants of all revenues, earnings, profits compensation, and benefits which they obtained as a result of their unlawful, unfair, and fraudulent conduct.

444.    The unlawful, unfair, and fraudulent business practices of Defendants, as alleged above, injured Boston Market, other restaurants, and members of the public in that Defendants' conduct restrained competition, causing Boston Market to pay supra-competitive and artificially inflated prices for Broilers.

445.    Defendants' Unlawful Business Practices:  As alleged, Defendants violated Section 1 of the Sherman Act and the California Cartwright Act by entering into and engaging in a continuing unlawful trust in restraint of trade and commerce.  Defendants illegally conspired, combined, and agreed to fix, raise, maintain, and/or stabilize prices, to restrict the output of, and to rig bids and/or allocate markets for Broilers.

446.    Defendants' Fraudulent Business Practices:  As alleged above, Defendants took affirmative actions to conceal their collusive activity by keeping communications with co-conspirators secret and making false statements publically and to Boston Market about the reasons

for artificially inflated prices of Broilers. Boston Market was likely to be deceived, and Boston Market was in fact deceived, by Defendants' fraudulent actions. As a result of Defendants' unfair competition, Boston Market suffered injury in fact and has lost money or property.

447. The acts, omissions, misrepresentations, practices, and non-disclosures of Defendants, as described above, constitute a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices with the meaning of Section 17200 *et seq.*

448. Defendants' acts, omissions, misrepresentations, practices, and non-disclosures are unfair, unconscionable, unlawful, and/or fraudulent independently of whether they constitute a violation of the Sherman Act and the Cartwright Act.

449. Defendants' acts or practices are fraudulent or deceptive within the meaning of Section 17200 *et seq.*

450. Defendants' conduct was carried out, effectuated, and perfected within the state of California.

451. By reason of the foregoing, Boston Market is entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as result of such business acts and practices described above.

## COUNT V
### Violation of the District of Columbia Antitrust Act
### D.C. Code § 28-4501, *et seq.*

452. Boston Market incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

453. The policy of District of Columbia Code, Title 28, Chapter 45 (Restraints of Trade)

is to "promote the unhampered freedom of commerce and industry throughout the District of Columbia by prohibiting restraints of trade and monopolistic practices."

454.    During the Conspiracy Period, Boston Market conducted a substantial volume of business in the District of Columbia and was registered to do business in the District of Columbia. During the Conspiracy Period, Boston Market submitted purchase orders for all shipments of Broilers it received at store locations in the District of Columbia from its locations in the District of Columbia. As a result of Defendants' Conspiracy, Boston Market took delivery of Broilers at artificially inflated prices at its store locations in the District of Columbia.

455.    During the Conspiracy Period, Boston Market purchased Broilers from Defendants, directly and through its vendors, for use in food preparation in Boston Market's District of Columbia locations, and not for resale in unaltered form. Boston Market then sold prepared chicken meals to customers in the District of Columbia.

456.    But for Defendants' conduct set forth herein, the price of Broilers paid by Boston Market would have been lower.

457.    During the Conspiracy Period, Boston Market conducted substantial business in the District of Columbia—including submitting purchase orders for, receiving invoices for, and receiving shipments of Broilers in the District of Columbia—suffered injury in the District of Columbia, and is entitled to the protection of the laws of the District of Columbia.

458.    Under District of Columbia law, Boston Market has standing to maintain an action under the antitrust provisions of the D.C. Code based on the facts alleged in this Complaint. *See* D.C. Code §28-4509(a).

459.    Defendants contracted, combined or conspired to act in restraint of trade within the District of Columbia, and to rig bids and allocate markets for Broilers sold within the District of

Columbia, in violation of D.C. Code §§ 28-4501—28-4581. Defendants' conduct substantially affected District of Columbia commerce.

460. Boston Market was injured with respect to its and/or its vendors' purchases of Broilers in the District of Columbia and is entitled to all forms of relief, including actual damages, treble damages, and interest, reasonable attorneys' fees and costs.

### COUNT VI
### Violation of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA")
### Fla. Stat. §§ 501.201 *et seq.*

461. Boston Market incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

462. During the Conspiracy Period, each of the Defendants named herein, directly, and through affiliates or subsidiaries or agents they dominated and controlled, sold Broilers in commerce in the United States, including Florida. Defendants' conduct, including but not limited to, their violations of the Sherman Act and various state laws as described herein, and fraudulent concealment caused injury to Boston Market, as Boston Market paid supra-competitive prices for Broilers.

463. Based on the foregoing, Defendants engaged in unfair and deceptive acts in violation of Fla. Stat. §§ 501.201 *et seq.*

464. During the Conspiracy Period, Boston Market conducted a substantial volume of business in the State of Florida and was registered to do business in Florida. During the Conspiracy Period, Boston Market submitted purchase orders for all shipments of Broilers it received at store locations in Florida from its locations in Florida. As a result of Defendants' Conspiracy, Boston Market took delivery of Broilers at artificially inflated prices at its store locations in Florida.

465. During the Conspiracy Period, Boston Market purchased Broilers from Defendants,

directly and through its vendors, for use in food preparation in Boston Market's Florida locations, and not for resale in unaltered form. Boston Market then sold prepared chicken meals to customers in Florida.

466. In violation of Section 501.204, Defendants agreed to act, and did in fact act, in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining at artificial and non-competitive levels, the bids for and prices at which Broilers were purchased, sold, distributed or obtained by Boston Market and/or its vendors in Florida, and took efforts to conceal their agreements from Boston Market. These acts constitute a common and continuous course of conduct of unfair competition by means of unfair, unlawful and/or fraudulent business acts or practices.

467. The conduct of the Defendants described herein—including but not limited to their violations of the Sherman Act—constitutes unfair and deceptive acts or practices within the meaning of FDUTPA, which is intended to "protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the course of any trade or commerce." Fla. Stat. § 501.202(2). FDUTPA is also intended to "make state consumer protection and enforcement consistent with established policies of federal law relating to consumer protection." Fla. Stat. § 501.202(3).

468. Defendants' unlawful conduct had the following effects: (1) price competition was restrained, suppressed, and eliminated for Broilers sold to Boston Market and/or its vendors in Florida; (2) Broiler bids and prices to Boston Market were raised, fixed, maintained and stabilized at artificially high levels for Broilers sold to Boston Market and/or its vendors in Florida; (3) Boston Market was deprived of free and open competition in the market for Broilers; and (4) Boston Market paid supra-competitive, artificially inflated prices for Broilers sold to it and/or its vendors in Florida.

469.    During the Conspiracy Period, Defendants' illegal conduct in violation of FDUTPA substantially affected Florida trade and commerce, and injured Boston Market in Florida, causing financial losses.

## COUNT VII
### Violation of the Illinois Antitrust Act,
### 740 Ill. Comp. Stat. Ann. 10/1, *et seq.*

470.    Boston Market incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

471.    The Illinois Antitrust Act, 740 Ill. Comp. Stat. Ann. 10/1, *et seq.*, aims "to promote the unhampered growth of commerce and industry throughout the State by prohibiting restraints of trade which are secured through monopolistic or oligarchic practices and which act or tend to act to decrease competition between and among persons engaged in commerce and trade . . . ." 740 ILCS 10/2.

472.    During the Conspiracy Period, Boston Market conducted a substantial volume of business in the State of Illinois and was registered to do business in Illinois.  During the Conspiracy Period, Boston Market submitted purchase orders for all shipments of Broilers it received at store locations in Illinois from its locations in Illinois. As a result of Defendants' Conspiracy, Boston Market took delivery of Broilers at artificially inflated prices at its store locations in Illinois.

473.    During the Conspiracy Period, Boston Market purchased Broilers from Defendants, directly and through its vendors, for use in food preparation in Boston Market's Illinois locations, and not for resale in unaltered form.  Boston Market then sold prepared chicken meals to customers in Illinois.

474.    As a result of Boston Market's presence in Illinois and the substantial business it conducted in Illinois—including the submission of purchase orders for, receiving invoices for, and

receiving shipment of Broilers in Illinois—Boston Market is entitled to the protection of the laws of Illinois.

475.    Under the Illinois Antitrust Act, Boston Market has standing to maintain an action for damages based on the facts alleged in this Complaint. 740 ILCS 10/7(2).

476.    Defendants made contracts or engaged in a combination or conspiracy with each other, though they would have been competitors but for their prior agreement, for the purpose of fixing, controlling or maintaining prices for Broilers sold to Boston Market and/or its vendors in Illinois, and/or for rigging bids and allocating customers or markets for Broilers within the intrastate commerce of Illinois.

477.    Boston Market was injured with respect to purchase orders placed, invoices received, and deliveries received for Broilers in Illinois and is entitled to all forms of relief, including actual damages, treble damages, reasonable attorneys' fees and costs.

**COUNT XIII**
**Violation of the Illinois Consumer Fraud and Deceptive Business Practices Act,**
**815 Ill. Comp. Stat. Ann. § 505/1, *et seq*.**

478.    Boston Market incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

479.    By reason of the conduct alleged herein, Defendants have violated 815 Ill. Comp. Stat. Ann. § 505/1, *et seq*.

480.    Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of, trade or commerce in the Broilers market, a substantial part of which occurred within Illinois, for the purpose of excluding competition or controlling, fixing, or maintaining prices or rigging bids to Boston Market, and allocating markets in the Broiler market.

481.    Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of Illinois.

482.    Defendants' conduct misled Boston Market, withheld material facts, and resulted in material misrepresentations to Boston Market.

483.    Defendants' unlawful conduct substantially affected Illinois's trade and commerce. As a direct and proximate cause of Defendants' unlawful conduct, Boston Market has been injured in its business or property and is threatened with further injury.

484.    Boston Market is within the scope of the Illinois statute.  By reason of the foregoing, Boston Market is entitled to seek all forms of relief, including actual damages or any other relief the Court deems proper under 815 Ill. Comp. Stat. Ann. § 505/10a, *et seq.*

**COUNT IX**
**Violation of the Kansas Restraint of Trade Act**
**Kan. Stat. Ann. § 50-101, *et seq*.**

485.    Boston Market incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

486.    The Kansas Restraint of Trade Act aims to prohibit practices which, *inter alia*, "tend to prevent full and free competition in the importation, transportation or sale of articles imported into this state." Kan. Stat. Ann. §50-112.

487.    During the Conspiracy Period, Boston Market conducted a substantial volume of business in the State of Kansas and was registered to do business in Kansas.  During the Conspiracy Period, Boston Market submitted purchase orders for all shipments of Broilers it received at store locations in Kansas from its locations in Kansas.  As a result of Defendants' Conspiracy, Boston Market took delivery of Broilers at artificially inflated prices at its store locations in Kansas.

488.    During the Conspiracy Period, Boston Market purchased Broilers from Defendants,

directly and through its vendors, for use in food preparation in Boston Market's Kansas locations, and not for resale in unaltered form. Boston Market then sold prepared chicken meals to customers in Kansas.

489. As a result of Boston Market's presence in Kansas and the substantial business it conducted in Kansas—including the submission of purchase orders for, receiving invoices for, and receiving shipment of Broilers in Kansas—Boston Market is entitled to the protection of the laws of Kansas.

490. Under the Kansas Restraint of Trade Act, Boston Market has standing to maintain an action based on the facts alleged in this Complaint. *See* Kan. Stat. Ann §50-161(b).

491. Defendants combined capital, skill or acts for the purposes of creating restrictions in trade or commerce of Broilers, increasing the price of Broilers sold to Boston Market and/or its vendors in Kansas, preventing competition in the sale of Broilers, rigging bids and allocating markets for the sale of broilers to Boston Market and/or its vendors in Kansas, in a manner that established the price of Broilers and precluded free and unrestricted competition among themselves in the sale of Broilers to Boston Market and/or its vendors in Kansas, in violation of Kan. Stat. Ann. §50-101, et seq.

492. But for Defendants' conduct set forth herein, the price of Broilers paid by Boston Market would have been lower. As a result, Boston Market was injured with respect to its and/or its vendors purchases of Broilers in Kansas and is entitled to all forms of relief, including actual damages, reasonable attorneys' fees and costs, and injunctive relief.

**COUNT X**
**Violation of the Michigan Antitrust Reform Act**
**Mich. Comp. Laws § 445.771, *et seq*.**

493.     Boston Market incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

494.     The Michigan Antitrust Reform Act aims "to prohibit contracts, combinations, and conspiracies in restraint of trade or commerce...to prohibit monopolies and attempts to monopolize trade or commerce...[and] to provide remedies, fines, and penalties for violations of this act." Mich. Act 274 of 1984.

495.     During the Conspiracy Period, Boston Market conducted a substantial volume of business in the State of Michigan and was registered to do business in Michigan.  During the Conspiracy Period, Boston Market submitted purchase orders for all shipments of Broilers it received at store locations in Michigan from its locations in Michigan.  As a result of Defendants' conspiracy, Boston Market took delivery of Broilers at artificially inflated prices at its store locations in Michigan.

496.     During the Conspiracy Period, Boston Market purchased Broilers from Defendants, directly and through its vendors, for use in food preparation in Boston Market's Michigan locations, and not for resale in unaltered form.  Boston Market then sold prepared chicken meals to customers in Michigan.

497.     As a result of Boston Market's presence in Michigan and the substantial business it conducted in Michigan—including the submission of purchase orders for, receiving invoices for, and receiving shipment of Broilers in Michigan—Boston Market is entitled to the protection of the laws of Michigan.

498.      Under the Michigan Antitrust Reform Act, Boston Market has standing to maintain an action based on the facts alleged in this Complaint. Mich. Comp. Laws. § 452.778(2).

499.    Defendants contracted, combined or conspired to restrain or commerce in the market for Broilers, in violation of Mich. Comp. Laws § 445.772, *et seq.*

500.    Defendants' violations of Michigan law were flagrant.  But for Defendants' conduct set forth herein, the price of Broilers paid by Boston Market would have been lower.

501.    As a result, Boston Market was injured with respect to its and/or its vendors' purchases of Broilers in Michigan and are entitled to all forms of relief, including actual damages, treble damages for flagrant violations, interest, costs, reasonable attorneys' fees, and injunctive or other appropriate equitable relief.

## COUNT XI
### Violation of Minnesota Antitrust Law of 1971,
### Minn. Stat. §325D.49, *et seq.*

502.    Boston Market incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

503.    The Minnesota Antitrust Law of 1971 aims to prohibit any contract, combination or conspiracy when any part thereof was created, formed, or entered into in Minnesota; any contract, combination or conspiracy, wherever created, formed or entered into; any establishment, maintenance or use of monopoly power; and any attempt to establish, maintain or use monopoly power, whenever any of these affect Minnesota trade or commerce.

504.    During the Conspiracy Period, Boston Market conducted a substantial volume of business in the State of Minnesota and was registered to do business in Minnesota.  During the Conspiracy Period, Boston Market submitted purchase orders for all shipments of Broilers it received at store locations in Minnesota from its locations in Minnesota. As a result of Defendants' Conspiracy, Boston Market took delivery of Broilers at artificially inflated prices at its store locations in Minnesota.

100

505. During the Conspiracy Period, Boston Market purchased Broilers from Defendants, directly and through its vendors, for use in food preparation in Boston Market's Minnesota locations, and not for resale in unaltered form. Boston Market then sold prepared chicken meals to customers in Minnesota.

506. As a result of Boston Market's presence in Minnesota and the substantial business it conducted in Minnesota—including the submission of purchase orders for, receiving invoices for, and receiving shipment of Broilers in Minnesota—Boston Market is entitled to the protection of the laws of Minnesota.

507. Under the Minnesota Antitrust Law of 1971, Boston Market has standing to maintain an action based on the facts alleged in this Complaint. *See* Minn. Stat. §325D.57.

508. Defendants contracted, combined or conspired in unreasonable restraint of trade or commerce in the market for Broilers within the intrastate commerce of and outside of Minnesota and fixed prices, rigged bids and allocated markets for Broilers sold to Boston Market and/or its vendors within the intrastate commerce of and outside of Minnesota, in violation of Minn. Stat. §325D.49, *et seq*.

509. But for Defendants' conduct set forth herein, the price of Broilers paid by Boston Market and/or its vendors would have been lower. As a result, Boston Market was injured with respect to its and/or its vendors' purchases of Broilers in Minnesota and are entitled to all forms of relief, including actual damages, treble damages, costs and disbursements, reasonable attorneys' fees, and injunctive relief necessary to prevent and restrain violations hereof.

**COUNT XII**
**Violation of the Minnesota Consumer Fraud Act,**
**Minn. Stat. § 325F.68, et seq.**

510.    Boston Market incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

511.    During the Conspiracy Period, Boston Market conducted a substantial volume of business in the State of Minnesota and was registered to do business in Minnesota.  During the Conspiracy Period, Boston Market submitted purchase orders for all shipments of Broilers it received at store locations in Minnesota from its locations in Minnesota. As a result of Defendants' conspiracy, Boston Market took delivery of Broilers at artificially inflated prices at its store locations in Minnesota.

512.    During the Conspiracy Period, Boston Market purchased Broilers from Defendants, directly and through its vendors, for use in food preparation in Boston Market's Minnesota locations, and not for resale in unaltered form.  Boston Market then sold prepared chicken meals to customers in Minnesota.

513.    As a result of Boston Market's presence in Minnesota and the substantial business it conducted in Minnesota—including the submission of purchase orders for, receiving invoices for, and receiving shipment of Broilers in Minnesota—Boston Market is entitled to the protection of the laws of Minnesota.

514.    By reason of the conduct alleged herein, Defendants have violated the Minnesota Consumer Fraud Act, Minn. Stat. §325F.68, et seq.

515.    Defendants engaged in a deceptive trade practice with the intent to injure competitors and consumers through supra-competitive profits.

516.    Defendants established, maintained, or used, or attempted to establish, a conspiracy in restraint of trade or commerce in the Broilers Market, a substantial part of which occurred within

Minnesota, for the purpose of controlling, fixing, or maintaining prices and rigging bids for Broilers sold to Boston Market in Minnesota, and allocating markets in the Broilers Market.

517.    Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of Minnesota.

518.    Defendants' conduct, specifically in the form of fraudulent concealment of their horizontal agreements, created a fraudulent or deceptive act or practice committed by a supplier in connection with a consumer transaction.

519.    Defendants' unlawful conduct substantially affected Minnesota's trade and commerce.

520.    Defendants' conduct was willful.  As a direct and proximate cause of Defendants' unlawful conduct, Boston Market has been injured in its business or property and is threatened with further injury.  Boston Market is within the scope of the Minnesota statute.

521.    By reason of the foregoing, Boston Market is entitled to seek all forms of relief, including damages, reasonable attorneys' fees and costs under Minn. Stat. §325F.68, et seq. and applicable case law.

**COUNT XIII**
**Violation of the Nebraska Junkin Act,**
**Neb. Rev. Stat. §59-801, _et seq._**

522.    Boston Market incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

523.    Chapter 59 of the Nebraska Revised Statute generally governs business and trade practices.  Sections 801 through 831 thereof, known as the Junkin Act, prohibit antitrust violations such as restraints of trade and monopolization.

524.    During the Conspiracy Period, Boston Market conducted a substantial volume of

business in the State of Nebraska and was registered to do business in Nebraska. During the Conspiracy Period, Boston Market submitted purchase orders for all shipments of Broilers it received at store locations in Nebraska from its locations in Nebraska. As a result of Defendants' Conspiracy, Boston Market took delivery of Broilers at artificially inflated prices at its store locations in Nebraska.

525.    During the Conspiracy Period, Boston Market purchased Broilers from Defendants, directly and through its vendors, for use in food preparation in Boston Market's Nebraska locations, and not for resale in unaltered form. Boston Market then sold prepared chicken meals to customers in Nebraska.

526.    As a result of Boston Market's presence in Nebraska and the substantial business it conducted in Nebraska —including the submission of purchase orders for, receiving invoices for, and receiving shipment of Broilers in Nebraska —Boston Market is entitled to the protection of the laws of Nebraska.

527.    Under Nebraska law, Boston Market has standing to maintain an action under the Junkin Act based on the facts alleged in this Complaint. *See* Neb. Rev. Stat. §59-821.

528.    Defendants contracted, combined or conspired in restraint of trade or commerce of Broilers within the intrastate commerce of Nebraska, by agreeing to fix prices and rig bids for Broilers sold to Boston Market and/or its vendors in Nebraska, and to allocate markets and otherwise control trade, in violation of Neb. Rev. Stat. §59-801, et seq.

529.    Boston Market was injured with respect to its or its vendors' purchases of Broilers in Nebraska and are entitled to all forms of relief, including actual damages or liquidated damages in an amount which bears a reasonable relation to the actual damages which have been sustained, as well as reasonable attorneys' fees, costs, and injunctive relief.

## COUNT XIV
### Violation of the Nebraska Consumer Protection Act,
### Neb. Rev. Stat. § 59-1602, *et seq.*

530.    Boston Market incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

531.    During the Conspiracy Period, Boston Market conducted a substantial volume of business in the State of Nebraska and was registered to do business in Nebraska.  During the Conspiracy Period, Boston Market submitted purchase orders for all shipments of Broilers it received at store locations in Nebraska from its locations in Nebraska. As a result of Defendants' Conspiracy, Boston Market took delivery of Broilers at artificially inflated prices at its store locations in Nebraska.

532.    During the Conspiracy Period, Boston Market purchased Broilers from Defendants, directly and through its vendors, for use in food preparation in Boston Market's Nebraska locations, and not for resale in unaltered form.  Boston Market then sold prepared chicken meals to customers in Nebraska.

533.    As a result of Boston Market's presence in Nebraska and the substantial business it conducted in Nebraska —including the submission of purchase orders for, receiving invoices for, and receiving shipment of Broilers in Nebraska —Boston Market is entitled to the protection of the laws of Nebraska.

534.    By reason of the conduct alleged herein, Defendants have violated Neb. Rev. Stat. §59-1602, *et seq.*

535.    Defendants have entered into a contract, combination, or conspiracy between two or more persons in restraint of trade or commerce in the Broilers Market, a substantial part of which occurred within Nebraska.

536. Defendants established, maintained, or attempted to establish, conspiracy in restraint of trade or commerce in the Broilers Market, for the purpose of excluding or limiting competition or controlling or maintaining prices or rigging bids for Broilers sold to Boston Market and/or its vendors in Nebraska, and allocating markets, a substantial part of which occurred within Nebraska.

537. Defendants' conduct was conducted with the intent to deceive Boston Market regarding the nature of Defendants' actions within the stream of Nebraska commerce.

538. Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of Nebraska.

539. Defendants' conduct misled Boston Market, withheld material facts, and had a direct or indirect impact upon Boston Market's ability to protect itself. Defendants' unlawful conduct substantially affected Nebraska's trade and commerce.

540. As a direct and proximate cause of Defendants' unlawful conduct, Boston Market has been injured in its business or property and is threatened with further injury. Boston Market is within the scope of the Nebraska statute.

541. By reason of the foregoing, Boston Market is entitled to seek all forms of relief available under Neb. Rev. Stat. §59-1614

### COUNT XV
### Violation of the Nevada Unfair Trade Practices Act,
### Nev. Rev. Stat. § 598A.010, *et seq.*

542. Boston Market incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

543. The Nevada Unfair Trade Practice Act ("NUTPA") states that "free, open and competitive production and sale of commodities...is necessary to the economic well-being of the citizens of the State of Nevada." Nev. Rev. Stat. Ann. § 598A.030(1).

544.    The policy of NUTPA is to prohibit acts in restraint of trade or commerce, to preserve and protect the free, open and competitive market, and to penalize all persons engaged in anticompetitive practices. Nev. Rev. Stat. Ann. § 598A.030(2). Such acts include, *inter alia*, price fixing, division of markets, allocation of customers, and monopolization of trade. Nev. Rev. Stat. Ann. § 598A.060.

545.    During the Conspiracy Period, Boston Market conducted a substantial volume of business in the State of Nevada and was registered to do business in Nevada.  During the Conspiracy Period, Boston Market submitted purchase orders for all shipments of Broilers it received at store locations in Nevada from its locations in Nevada. As a result of Defendants' Conspiracy, Boston Market took delivery of Broilers at artificially inflated prices at its store locations in Nevada.

546.    During the Conspiracy Period, Boston Market purchased Broilers from Defendants, directly and through its vendors, for use in food preparation in Boston Market's Nevada locations, and not for resale in unaltered form.  Boston Market then sold prepared chicken meals to customers in Nevada.

547.    As a result of Boston Market's presence in Nevada and the substantial business it conducted in Nevada —including the submission of purchase orders for, receiving invoices for, and receiving shipment of Broilers in Nevada —Boston Market is entitled to the protection of the laws of Nevada.

548.    Under Nevada law, indirect purchasers have standing to maintain an action under NUTPA based on the facts alleged in this Complaint. Nev. Rev. Stat. Ann. §598A.210(2).

549.    Defendants fixed prices for Broilers sold to Boston Market and/or its vendors in Nevada, rigged bids and divided Nevada markets, allocated Nevada customers, and engaged in a

contract, combination or conspiracy in restraint of trade in violation of Nev. Rev. Stat. Ann. § 598A, et seq.

550.    But for Defendants' conduct set forth herein, the prices of Broilers paid by Boston Market and/or its vendors for Broilers in Nevada would have been lower.  Boston Market was injured with respect to the Broilers purchased in Nevada at supra-competitive prices caused by Defendants' conduct.

551.    Accordingly, Boston Market is entitled to all forms of relief, including actual damages, treble damages, reasonable attorneys' fees, costs, and injunctive relief.

552.    In accordance with the requirements of § 598A.210(3), notice of this action was mailed to the Nevada Attorney General by Plaintiff.

<u>**COUNT XVI**</u>
**Violation of the Nevada Deceptive Trade Practices Act,**
**Nev. Rev. Stat. § 598.0903, *et seq.***

553.    Boston Market incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

554.    During the Conspiracy Period, Boston Market conducted a substantial volume of business in the State of Nevada and was registered to do business in Nevada.  During the Conspiracy Period, Boston Market submitted purchase orders for all shipments of Broilers it received at store locations in Nevada from its locations in Nevada. As a result of Defendants' conspiracy, Boston Market took delivery of Broilers at artificially inflated prices at its store locations in Nevada.

555.    During the Conspiracy Period, Boston Market purchased Broilers from Defendants, directly and through its vendors, for use in food preparation in Boston Market's Nevada locations, and not for resale in unaltered form.  Boston Market then sold prepared chicken meals to customers

in Nevada.

556.    As a result of Boston Market's presence in Nevada and the substantial business it conducted in Nevada —including the submission of purchase orders for, receiving invoices for, and receiving shipment of Broilers in Nevada —Boston Market is entitled to the protection of the laws of Nevada.

557.    By reason of the conduct alleged herein, Defendants have violated Nev. Rev. Stat. § 598.0903, *et seq.*

558.    Defendants engaged in a deceptive trade practice with the intent to injure Boston Market and to substantially lessen competition.

559.    Defendants established, maintained, or used or attempted to establish a conspiracy in restraint of trade or commerce in the Broilers Market, a substantial part of which occurred within Nevada, for the purpose of excluding competition or controlling, fixing, or maintaining prices of Broilers sold to Boston Market in Nevada.

560.    Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of Nevada.

561.    Defendants' conduct amounted to a fraudulent act or practice committed by a supplier in connection with a consumer transaction.

562.    Defendants' unlawful conduct substantially affected Nevada's trade and commerce.

563.    Defendants' conduct was willful.  As a direct and proximate cause of Defendants' unlawful conduct, Boston Market has been injured in its business or property and are threatened with further injury.

564.    By reason of the foregoing, Boston Market is entitled to seek all forms of relief, including damages, reasonable attorneys' fees and costs, and a civil penalty of up to $5,000 per violation under Nev. Rev. Stat. § 598.0993.

**COUNT XVII**
**Violation of New Hampshire's Consumer Protection Act**
**N.H. Rev. Stat. Ann. Tit. XXXI, § 358-A,** *et seq.*

565.    Boston Market incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

566.    During the Conspiracy Period, Boston Market conducted a substantial volume of business in the State of New Hampshire and was registered to do business in New Hampshire. During the Conspiracy Period, Boston Market submitted purchase orders for all shipments of Broilers it received at store locations in New Hampshire from its locations in New Hampshire.  As a result of Defendants' Conspiracy, Boston Market took delivery of Broilers at artificially inflated prices at its store locations in New Hampshire.

567.    During the Conspiracy Period, Boston Market purchased Broilers from Defendants, directly and through its vendors, for use in food preparation in Boston Market's New Hampshire locations, and not for resale in unaltered form.  Boston Market then sold prepared chicken meals to customers in New Hampshire.

568.    As a result of Boston Market's presence in New Hampshire and the substantial business it conducted in New Hampshire —including the submission of purchase orders for, receiving invoices for, and receiving shipment of Broilers in New Hampshire —Boston Market is entitled to the protection of the laws of New Hampshire.

569.    By reason of the conduct alleged herein, Defendants have violated N.H. Rev. Stat. Ann. tit. XXXI, §358-A, *et seq*.

570.     Defendants have entered into a contract, combination, or conspiracy between two or more persons in restraint of, trade or commerce in the Broilers Market, a substantial part of which occurred within New Hampshire.

571.     Defendants established, maintained, or used, or attempted to establish, a conspiracy in restraint of trade or commerce in the Broilers Market, for the purpose of excluding or limiting competition or controlling or maintaining prices of Broilers sold to Boston Market in New Hampshire, a substantial part of which occurred within New Hampshire.

572.     Defendants' conduct was conducted with the intent to deceive Boston Market regarding the nature of Defendants' actions within the stream of New Hampshire commerce.

573.     Defendants' conduct was unfair or deceptive within the conduct of commerce within the State of New Hampshire.

574.     Defendants' conduct was willful and knowing.  Defendants' conduct misled Boston Market, withheld material facts, and had a direct impact upon Boston Market's ability to protect itself.

575.     Defendants' unlawful conduct substantially affected New Hampshire's trade and commerce.

576.     As a direct and proximate cause of Defendants' unlawful conduct, Boston Market has been injured in its business or property and is threatened with further injury.  Boston Market is within the scope of the New Hampshire statute.

577.     By reason of the foregoing, Boston Market is entitled to seek all forms of relief available under N.H. Rev. Stat. Ann. Tit. XXXI, §§358- A:10 and 358-A:10-a.

**COUNT XVIII**
**Violation of New Mexico Antitrust Act**
**N.M. Stat. Ann. § 57-1-1, *et seq.***

578.     Boston Market incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

579.     The New Mexico Antitrust Act aims to prohibit restraints of trade and monopolistic practices. N.M. Stat. Ann. 57-1-15.

580.     During the Conspiracy Period, Boston Market conducted a substantial volume of business in the State of New Mexico and was registered to do business in New Mexico.  During the Conspiracy Period, Boston Market submitted purchase orders for all shipments of Broilers it received at store locations in New Mexico from its locations in New Mexico.  As a result of Defendants' Conspiracy, Boston Market took delivery of Broilers at artificially inflated prices at its store locations in New Mexico.

581.     During the Conspiracy Period, Boston Market purchased Broilers from Defendants, directly and through its vendors, for use in food preparation in Boston Market's New Mexico locations, and not for resale in unaltered form.  Boston Market then sold prepared chicken meals to customers in New Mexico.

582.     As a result of Boston Market's presence in New Mexico and the substantial business it conducted in New Mexico —including the submission of purchase orders for, receiving invoices for, and receiving shipment of Broilers in New Mexico —Boston Market is entitled to the protection of the laws of New Mexico.

583.     Under New Mexico law, Boston Market has standing to maintain an action based on the facts alleged in this Complaint. N.M. Stat. Ann. §57-1-3.

584.    Defendants contracted, agreed, combined or conspired to restrain trade for Broilers sold to Boston Market and/or its vendors within the intrastate commerce of New Mexico, in violation of N.M. Stat. Ann. §57-1-1, *et seq.*

585.    Boston Market was injured with respect to purchases of Broilers in New Mexico and are entitled to all forms of relief, including actual damages, treble damages, reasonable attorneys' fees, costs, and injunctive relief.

<u>**COUNT XIX**</u>
**Violation of the New Mexico Unfair Practices Act,**
**N.M. Stat. Ann. §§ 57-12-3, *et seq.***

586.    Boston Market incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

587.    During the Conspiracy Period, Boston Market conducted a substantial volume of business in the State of New Mexico and was registered to do business in New Mexico. During the Conspiracy Period, Boston Market submitted purchase orders for all shipments of Broilers it received at store locations in New Mexico from its locations in New Mexico. As a result of Defendants' Conspiracy, Boston Market took delivery of Broilers at artificially inflated prices at its store locations in New Mexico.

588.    During the Conspiracy Period, Boston Market purchased Broilers from Defendants, directly and through its vendors, for use in food preparation in Boston Market's New Mexico locations, and not for resale in unaltered form. Boston Market then sold prepared chicken meals to customers in New Mexico.

589.    As a result of Boston Market's presence in New Mexico and the substantial business it conducted in New Mexico —including the submission of purchase orders for, receiving invoices for, and receiving shipment of Broilers in New Mexico —Boston Market is entitled to the

protection of the laws of New Mexico.

590. By reason of the conduct alleged herein, Defendants have violated N.M. Stat. Ann. §§57-12-3, *et seq.*

591. Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of trade or commerce in the Broilers market, a substantial part of which occurred within New Mexico.

592. Defendants established, maintained, or used, or attempted to establish a conspiracy in restraint of trade or commerce in the market for Broilers, a substantial part of which occurred within New Mexico, for the purpose of excluding competition or controlling, fixing, or maintaining prices and rigging bids for Broilers sold to Boston Market in New Mexico and allocating markets for Broilers.

593. Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of New Mexico.

594. Defendants' conduct misled Boston Market, withheld material facts, and resulted in material misrepresentations to Boston Market.

595. Defendants' unlawful conduct substantially affected New Mexico's trade and commerce.

596. Defendants' conduct constituted "unconscionable trade practices" in that such conduct, inter alia, resulted in a gross disparity between the value received by Boston Market and the price paid by them for Broilers as set forth in N.M. Stat. Ann. §57-12-2E.

597. Defendants' conduct was willful. As a direct and proximate cause of Defendants' unlawful conduct, Boston Market has been injured in its business or property and is threatened with further injury.

598.    By reason of the foregoing, Boston Market is entitled to seek all forms of relief, including actual damages or up to $300 per violation, whichever is greater, plus reasonable attorney's fees under N.M. Stat. Ann. §§57-12-10.

**COUNT XX**
**Violation of the Donnelly Antitrust Act,**
**N.Y. Gen. Bus. Law § 340, *et. seq.***

599.    Boston Market incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

600.    Article 22 of the New York General Business Law general prohibits contracts or agreements in restraint of trade, with the policy of encouraging competition or the free exercise of any activity in the conduct of any business, trade or commerce in New York. N.Y. Gen. Bus. Law §340(1).

601.    During the Conspiracy Period, Boston Market conducted a substantial volume of business in the State of New York and was registered to do business in New York. During the Conspiracy Period, Boston Market submitted purchase orders for all shipments of Broilers it received at store locations in New York from its locations in New York. As a result of Defendants' Conspiracy, Boston Market took delivery of Broilers at artificially inflated prices at its store locations in New York.

602.    During the Conspiracy Period, Boston Market purchased Broilers from Defendants, directly and through its vendors, for use in food preparation in Boston Market's New York locations, and not for resale in unaltered form. Boston Market then sold prepared chicken meals to customers in New York.

603.    As a result of Boston Market's presence in New York and the substantial business it conducted in New York —including the submission of purchase orders for, receiving invoices for,

and receiving shipment of Broilers in New York —Boston Market is entitled to the protection of the laws of New York.

604.    But for Defendants' conduct set forth herein, the price of Broilers sold to Boston Market and/or its vendors in New York would have been lower.

605.    Under New York law, Boston Market has standing to maintain an action based on the facts alleged in this Complaint. N.Y. Gen. Bus. Law §340(6).

606.    Defendants established or maintained a conspiracy within intrastate commerce of New York for the trade or commerce of Broilers sold to Boston Market and/or its Vendors and restrained competition in the free exercise of the conduct of the business of Broilers within the intrastate commerce of New York, in violation of N.Y. Gen. Bus. Law §340, *et seq.*

607.    Boston Market was injured with respect to Broilers sold to Boston Market and/or its vendors in New York and is entitled to all forms of relief, including actual damages, treble damages, costs not exceeding $10,000, and reasonable attorneys' fees.

608.    In accordance with the requirements of N.Y. Gen. Bus. Law § 340(5), notice of this action was mailed to the New York Attorney General by Plaintiff.

<u>**COUNT XXI**</u>
**Violation of the North Carolina Unfair Trade and Business Practices Act,**
**N.C. Gen. Stat. § 75-1, *et seq.***

609.    Boston Market incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

610.    During the Conspiracy Period, Boston Market conducted a substantial volume of business in the State of North Carolina and was registered to do business in North Carolina.  During the Conspiracy Period, Boston Market submitted purchase orders for all shipments of Broilers it received at store locations in North Carolina from its locations in North Carolina. As a result of

Defendants' Conspiracy, Boston Market took delivery of Broilers at artificially inflated prices at its store locations in North Carolina.

611.    During the Conspiracy Period, Boston Market purchased Broilers from Defendants, directly and through its vendors, for use in food preparation in Boston Market's North Carolina locations, and not for resale in unaltered form.  Boston Market then sold prepared chicken meals to customers in North Carolina.

612.    As a result of Boston Market's presence in North Carolina and the substantial business it conducted in North Carolina—including the submission of purchase orders for, receiving invoices for, and receiving shipment of Broilers in North Carolina —Boston Market is entitled to the protection of the laws of North Carolina.

613.    Defendants established, maintained, or used, or attempted to establish, a conspiracy in restraint of trade or commerce in the market for Broilers, for the purpose of affecting competition or controlling, fixing, or maintaining prices and rigging bids for Broilers sold to Boston Market and/or its vendors in North Carolina, a substantial part of which occurred within North Carolina.

614.    Defendants' unlawful conduct substantially affected North Carolina's trade and commerce.

615.    As a direct and proximate cause of Defendants' unlawful conduct, Boston Market has been injured in its business or property and is threatened with further injury.

616.    By reason of the foregoing, Boston Market is entitled to seek all forms of relief available, including treble damages, under N.C. Gen. Stat. § 75-1, *et seq.*

**COUNT XXII**
**Violation of the Rhode Island Antitrust Act**
**R.I. Gen. Laws Ann. §6-36-1, *et seq.***

617. Boston Market incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

618. The Rhode Island Antitrust Act aims to promote the unhampered growth of commerce and industry throughout Rhode Island by prohibiting unreasonable restraints of trade and monopolistic practices that hamper, prevent or decrease competition. R.I. Gen. Laws §6-36-2(a)(2).

619. During the Conspiracy Period, Boston Market conducted a substantial volume of business in the State of Rhode Island and was registered to do business in Rhode Island. During the Conspiracy Period, Boston Market submitted purchase orders for all shipments of Broilers it received at store locations in Rhode Island from its locations in Rhode Island. As a result of Defendants' Conspiracy, Boston Market took delivery of Broilers at artificially inflated prices at its store locations in Rhode Island.

620. During the Conspiracy Period, Boston Market purchased Broilers from Defendants, directly and through its vendors, for use in food preparation in Boston Market's Rhode Island locations, and not for resale in unaltered form. Boston Market then sold prepared chicken meals to customers in Rhode Island.

621. As a result of Boston Market's presence in Rhode Island and the substantial business it conducted in Rhode Island —including the submission of purchase orders for, receiving invoices for, and receiving shipment of Broilers in Rhode Island —Boston Market is entitled to the protection of the laws of Rhode Island.

622. But for Defendants' conduct set forth herein, the price of Broilers sold to Boston Market and/or its vendors would have been lower.

623. Under the Rhode Island Antitrust Act, as of July 15, 2013, Boston Market has standing to maintain an action based on the facts alleged in this Complaint. *See* R.I. Gen. Laws §6-

36-11(a). In Rhode Island, Boston Market's claims alleged herein run from July 15, 2013, through the date that the effects of Defendants' anticompetitive conduct cease.

624. Defendants contracted, combined and conspired in restraint of trade of Broilers within the intrastate commerce of Rhode Island, and established, maintained or used, or attempted to establish, maintain or use, a conspiracy in restrain of trade of Broilers for the purpose of excluding competition or controlling, fixing or maintaining prices and rigging bids for Broilers sold to Boston Market and/or its vendors in Rhode Island, and allocating markets for Broilers within the intrastate commerce of Rhode Island, in violation of R.I. Gen. Laws §6-36-1, et seq.

625. Boston Market was injured with respect to its and/or its vendors' purchases of Broilers in Rhode Island and are entitled to all forms of relief, including actual damages, treble damages, reasonable costs, reasonable attorneys' fees, and injunctive relief.

626. In accordance with the requirements of R.I. Gen. Laws Ann. § 6-36-21, notice of this action was mailed to the Rhode Island Attorney General by Boston Market and proof of service has been filed with the Court.

## <u>COUNT XXIII</u>
### Violation of the South Carolina Unfair Trade Practices Act,<br>S.C. Code Ann. §§ 39-5-10, *et seq.*

627. Boston Market incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

628. By reason of the conduct alleged herein, Defendants have violated S.C. Code Ann. §§39-5-10.

629. Defendants have entered into a contract, combination, or conspiracy between two or more persons in restraint of trade or commerce in the Broilers Market, a substantial part of which occurred within South Carolina.

630.    Defendants established, maintained, or used, or attempted to establish, a conspiracy in restraint of trade or commerce in the market for Broilers, for the purpose of excluding or limiting competition or controlling or maintaining prices, or rigging bids for Broilers sold to Boston Market and/or its vendors in South Carolina, and allocating markets, a substantial part of which occurred within South Carolina.

631.    Defendants' conduct was conducted with the intent to deceive Boston Market regarding the nature of Defendants' actions within the stream of South Carolina commerce.

632.    Defendants' conduct misled Boston Market, withheld material facts, and had a direct or indirect impact upon Boston Market's ability to protect itself.  Boston Market is within the scope of the South Carolina statute.

633.    Defendants' unlawful conduct was unfair or deceptive and substantially affected South Carolina trade and commerce.

### COUNT XXIV
### Violation of Virginia Consumer Protection Act
### VA Code Ann. § 59.1, *et seq.*

634.    Boston Market incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

635.    By reason of the conduct alleged herein, Defendants have violated Va. Code Ann. § 59.1-196, *et seq*.

636.    During the Conspiracy Period, Boston Market conducted a substantial volume of business in the State of Virginia and was registered to do business in Virginia.  During the Conspiracy Period, Boston Market submitted purchase orders for all shipments of Broilers it received at store locations in Virginia from its locations in Virginia.  As a result of Defendants' Conspiracy, Boston Market took delivery of Broilers at artificially inflated prices at its store

locations in Virginia.

637.    During the Conspiracy Period, Boston Market purchased Broilers from Defendants, directly and through its vendors, for use in food preparation in Boston Market's Virginia locations, and not for resale in unaltered form.  Boston Market then sold prepared chicken meals to customers in Virginia.

638.    As a result of Boston Market's presence in Virginia and the substantial business it conducted in Virginia —including the submission of purchase orders for, receiving invoices for, and receiving shipment of Broilers in Virginia —Boston Market is entitled to the protection of the laws of Virginia.

639.    Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of trade or commerce in the Broilers market, a substantial part of which occurred in Virginia.

640.    Defendants conspired for the purpose of excluding or limiting competition or controlling or maintaining prices, or rigging bids for Broilers sold to Boston Market and/or its vendors in Virginia, and allocating markets, a substantial part of which occurred within Virginia.

641.    Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of Virginia.

642.    Defendants' conduct amounted to a fraudulent act or practice committed by a supplier in connection with a consumer transaction.

643.    Defendants' unlawful conduct substantially affected Virginia's trade and commerce.

644.    Defendants' conduct was willful.  As a direct and proximate cause of Defendants' unlawful conduct, Boston Market has been injured in its business or property.

645.     By reason of the foregoing, Boston Market is entitled to seek all forms of relief available, including treble damages, under Va. Code Ann. § 59.1-204(A), *et seq*.

**Count XXV**
**Violation of Wisconsin Antitrust Act**
**Wis. Stat. Ann. § 133.18(1)(1), *et seq*.**

646.     Boston Market incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

647.     Chapter 133 of the Wisconsin Statutes governs trust and monopolies, with the intent "to safeguard the public against the creation or perpetuation of monopolies and to foster and encourage competition by prohibiting unfair and discriminatory business practices which destroy or hamper competition." Wis. Stat. § 133.01.

648.     During the Conspiracy Period, Boston Market conducted a substantial volume of business in the State of Wisconsin and was registered to do business in Wisconsin.  During the Conspiracy Period, Boston Market submitted purchase orders for all shipments of Broilers it received at store locations in Wisconsin from its locations in Wisconsin.  As a result of Defendants' Conspiracy, Boston Market took delivery of Broilers at artificially inflated prices at its store locations in Wisconsin.

649.     During the Conspiracy Period, Boston Market purchased Broilers from Defendants, directly and through its vendors, for use in food preparation in Boston Market's Wisconsin locations, and not for resale in unaltered form.  Boston Market then sold prepared chicken meals to customers in Wisconsin.

650.     As a result of Boston Market's presence in Wisconsin and the substantial business it conducted in Wisconsin —including the submission of purchase orders for, receiving invoices for, and receiving shipment of Broilers in Wisconsin—Boston Market is entitled to the protection of the

laws of Wisconsin.

651.     Under Wisconsin law, Boston Market has standing under the antitrust provisions of the Wisconsin Statutes to maintain an action based on the facts alleged in this Complaint. *See* Wis. Stat. § 133.18(a).

652.     Defendants contracted, combined or conspired in restraint of trade or commerce of Broilers, with the intention of injuring or destroying competition therein, in violation of Wis. Stat. §133.01, et seq.

653.     Defendants' and their co-conspirators' anticompetitive activities have directly, foreseeably and proximately caused injury to Boston Market.  Its injuries consist of: (1) being denied the opportunity to purchase lower-priced Broilers from Defendants in Wisconsin, and (2) paying higher prices for Defendants' Broilers than it would have in the absence of Defendants' conduct.  These injuries are of the type of the laws of Wisconsin were designed to prevent, and flow from that which makes Defendants' conduct unlawful.

654.     Boston Market was injured with respect to Broilers sold to Boston Market and/or its vendors in Wisconsin.  Accordingly, Boston Market is entitled to all forms of relief, including actual damages, treble damages, costs and reasonable attorneys' fees, and injunctive relief. Defendants are jointly and severally liable for all damages suffered by Boston Market.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that the Court:

A.     Enter joint and several judgments against Defendants in favor of Plaintiff;

B.     Award Plaintiff damages in an amount to be determined at trial to the maximum extent allowed under federal antitrust laws, and enter a joint and several judgment in favor of Plaintiff against Defendants in an amount to be trebled as provided by law;

C.     Award Plaintiff post-judgment interest as provided by law, with such interest to be

awarded at the highest legal rate;

       D.     Award Plaintiff's attorneys' fees, litigation expenses, and costs, as provided by law;

and

       E.     Grant Plaintiff such other and further relief that the Court may deem just and proper.

## <u>JURY DEMAND</u>

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury on all issues so triable.

Dated: June 12, 2020

Respectfully submitted,

BOSTON MARKET CORPORATION

By: /s/ _____*Lori P. Lustrin*_____
Robert W. Turken (*pro hac vice*)
Lori P. Lustrin (*pro hac vice*)
Scott N. Wagner (*pro hac vice*)
**BILZIN SUMBERG BAENA PRICE &
AXELROD LLP**
1450 Brickell Ave., Suite 2300
Miami, Florida 33131-3456
Telephone:  305-374-7580
Facsimile:  305-374-7593
rturken@bilzin.com
llustrin@bilzin.com
swagner@bilzin.com

Andrew P. Bleiman
Mark I. Fishbein
**MARKS & KLEIN, LLP**
1363 Shermer Road, Suite 318
Northbrook, Illinois 60062
Telephone: 312-206-5162
Facsimile: 312-420-5568
andrew@marksklein.com
mark@marksklein.com